**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN R. SKEELS, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> PIEDMONT LITHIUM INC., KEITH D. PHILLIPS, BRUCE CZACHOR, and GREGORY SWAN, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff John R. Skeels ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Piedmont Lithium Inc. f/k/a/ Piedmont Lithium Limited ("Piedmont" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of Piedmont between March 16, 2018 and July 19, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Piedmont engages in the exploration and development of resource projects. Of particular note, the Company primarily holds a 100% interest in a lithium project covering 2,322 acres in the North Carolina.

8.      Defendant Piedmont is incorporated in Delaware and maintains its principal executive offices at 32N Main Street Suite 100 Belmont, NC. Piedmont shares are listed on the NASDAQ under the ticker symbol "PLL." Until December 2018, Piedmont American Depositary Shares ("ADSs") were listed on the NASDAQ under the ticker symbol "PLLL." On May 17, 2021, in connection with Piedmont's redomiciliation from Australia to the United States, Piedmont's ADS holders received one share of Piedmont common ctock for each ADS.

9.      Defendant Keith D. Phillips ("Phillips") has served as the Company's President and Chief Executive Officer throughout the Class Period.

10.      Defendant Bruce Czachor ("Czachor") has served as the Company's Vice President and General Counsel throughout the Class Period.

11.      Defendant Gregory Swan ("Swan") has served as the Company's Secretary throughout the Class Period and served as the Company's Chief Financial Officer during the Class Period.

12.      Defendants Phillips, Czachor, and Swan are collectively referred to herein as the "Individual Defendants."

13.      Each of the Individual Defendants:

3

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>
<u>**Materially False and Misleading Statements**</u>

17.     On March 16, 2018, Piedmont filed with the SEC a Registration Statement on Form 20-F (the "Registration Statement") which was signed by Defendant Phillips.

18.     The Registration Statement discussed the Company's need for proper permits:

4

**Permitting**

Our current drilling exploration activities for the Project are authorized under a general permit approved by the North Carolina Department of Environmental Quality DEQ in April 2017. …

***Prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits authorizing, among other things, any mine development activities and mine operating activities.*** Obtaining and renewing governmental permits is a complex and time-consuming process and involves numerous jurisdictions, public hearings and possibly costly undertakings. ***The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority.*** We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties. See "Risk Factors—We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming."

(Emphasis added.)

19.    The Registration Statement even discussed "risks" to the Company with regards to permits, neglecting to inform potential investors that the Company may simply neglect filing timely applications or anger the local population and elected and appointed officials. The Registration Statement stated the following regarding "risks" with regards to permits and relationships with the local population and elected and appointed officials:

***We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.***

We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority. We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required

5

to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities.

Private parties, such as environmental activists, frequently attempt to intervene in the permitting process and to persuade regulators to deny necessary permits or seek to overturn permits that have been issued. Obtaining the necessary governmental permits involves numerous jurisdictions, public hearings and possibly costly undertakings. These third-party actions can materially increase the costs and cause delays in the permitting process and could cause us to not proceed with the development or operation of a property. ***In addition, our ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on our ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law.*** Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

(Emphasis added.)

20. On June 7, 2018, the Company issued a press release entitled "PHASE 3 DRILLING COMPLETED WITH FURTHER HIGH GRADE MINERALISATION IDENTIFIED" which stated the following, in pertinent part, regarding the Company's progress with exploration and its success at receiving proper permits (including state and local permits):

"***The necessary state permits have been received and drilling is underway*** at the Sunnyside Property with one hole completed." (Emphasis added.)

21. On June 14, 2018, the Company issued a press release entitled "PIEDMONT LITHIUM ANNOUNCES MAIDEN MINERAL RESOURCE" which stated the following, in pertinent part, regarding the Company's local government relations:

Piedmont is now focused on the completion of the Scoping Study which is expected in Q3 2018 and will reflect the ***Company's strategy of building an integrated lithium processing business based on proven, conventional technologies and***

6

*benefitting from the inherent advantages of Piedmont's strategic North Carolina location, including*; …

✓      **Strong local government support**

(Emphasis added.)

22.      On July 19, 2018, the Company issued a press release entitled "SCOPING STUDY DELIVERS OUTSTANDING RESULTS" which stated the following, in pertinent part, regarding the Company's need for and plan for proper permits:

**Site Plans**

**Mining Operations**

A preliminary integrated site plan including mining operations, waste disposal, and concentrator was developed by Primero Group during the course of this Study.  The Site plan will be refined in future study phases. …

The site plan has been designed to avoid major drainage features and any flood zones.  *Optimisation of* mine sequence, pit shells, waste placement, drainage, erosion and sediment control *and permit design will be undertaken during the PFS* [Pre-Feasibility Study].

                    *       *       *

**Environmental and Social Impact Assessment**

*HDR Engineering has been retained by Piedmont to support permitting activities on the project.  HDR completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities.* …

Baseline activities required to submit a 404 permit were started in April 2018 and wetlands inventory work was completed in May 2018.   A jurisdictional determination request was submitted to the US ACE in May 2018. …

Piedmont has authorised HDR to undertake a detailed cultural survey of the site at the request of the North Carolina State Historical Preservation Office (SHPO).

*HDR will start a 404 permit application and mining permit application process upon completion of this Scoping Study.*

7

*Piedmont's overall permitting timeline for the mine and concentrator is shown in Table 8.*

| Table 8: Estimated Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | ░ | ░ | ░ | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | ■ | | | | | | | | | | | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| 404 Permit Application Preparation | | | ■ | ■ | | | | | | | | | | | | | | | | | | | | |
| 404 Permit Review and Approval Process | | | | | | | | | | | | | ▨ | ▨ | ▨ | ▨ | ▨ | | | ▨ | ▨ | ▨ | | |
| Mining Permit Application Preparation | | | | | | | | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | |

\*          \*          \*

Regionally, North Carolina was named by Forbes Magazine as the #1 state for business in 2017. ***Piedmont has initiated discussion with the Gaston County Economic Development Commission (EDC) to assist in coordination of permitting and interface with utility and rail providers.*** Gaston County local government actively recruits manufacturing businesses to the region. The county relies heavily on manufacturing for employment (26%) and is generally expected to support the vertically-integrated project.

(Emphasis added.)

23.    On July 23, 2018, the Company filed an investor presentation as part of a Form 6-K filed with the SEC signed by Defendant Czachor which provided the following slide showing the Company's purported "Rapid Development Timeline" which continued to show permitting ending before 2020.

8



24.    On September 13, 2018, the Company issued a press release entitled "UPDATED SCOPING STUDY IMPROVES PROJECT ECONOMICS" which stated the following, in pertinent part, regarding the Company's need for and plan for proper permits:

**Site Plans**

**Mining Operations**

A preliminary integrated site plan including mining operations, waste disposal, and concentrator was developed by Primero Group during the course of this Scoping Study.  The Site plan will be refined in future study phases.  Additional drilling of current exploration targets is required as well as condemnation drilling of planned waste rock stockpile and concentrator locations.

The site plan has been designed to avoid major drainage features and any flood zones.  Optimisation of mine sequence, pit shells, waste placement, drainage, erosion and sediment control and permit design will be undertaken during the PFS.

**Environmental and Social Impact Assessment**

*HDR Engineering has been retained by Piedmont to support permitting activities on the project.  HDR completed a critical issues analysis of the Project in*

9

***February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities.*** …

Baseline activities required to submit a 404 permit were started in April 2018 and wetlands inventory work was completed in May 2018. A jurisdictional determination request was submitted to the US ACE in May 2018. …

Piedmont has authorised HDR to undertake a detailed cultural survey of the site at the request of the North Carolina State Historical Preservation Office (SHPO).

HDR started preparation of a 404 permit application and mining permit application in September 2018.

Piedmont's overall permitting timeline for the mine and concentrator is shown in Table 19.

| Table 19: Estimated Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | | | | | | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | | | | | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | | | | | | | | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| 404 Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| 404 Permit Review and Approval Process | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | | | | | | | | |

\*     \*     \*

Regionally, North Carolina was named by Forbes Magazine as the #1 state for business in 2017. ***Piedmont has initiated discussion with the Gaston County Economic Development Commission (EDC) to assist in coordination of permitting and interface with utility and rail providers.*** Gaston County local government actively recruits manufacturing businesses to the region. The county relies heavily on manufacturing for employment (26%) and is generally expected to support the vertically-integrated project.

(Emphasis added.)

25.     On September 26, 2018, the Company filed as part of a Form 6-K filed with the SEC signed by Defendant Czachor its 2018 Annual Report.

26.     The Company's 2018 Annual Report stated the following, in pertinent part, regarding the Company's need for and plan for proper permits:

10

**Highlights**

Highlights during and subsequent to the end of the year were as follows:

*       *       *

(f)      ***Commenced permitting on the Project for all federal, state and local permits, which is targeted for completion in 2019[.]***

*       *       *

●       Complete permit applications and secure the necessary permits to commence mining and processing operations at the Project[.]

(Emphasis added.)

27.      The Company's 2018 Annual Report included a "MESSAGE FROM THE CEO" from Defendant Phillips which stated the following, in pertinent part, regarding the Company's progress, plan for proper permits, any potential issues with the lithium market, and government relations:

The past twelve months were a period of great accomplishment for us, as we transition from 'explorer' to 'developer', achieving many important milestones.

*       *       *

***The Scoping Study reinforced the fundamental advantages of our location in North Carolina, USA***: …
●       **Stable and investment friendly jurisdiction** – ***stable legal regime, established permitting process for mining operations***, with low corporate taxes and no state mining royalties**.**

While our results to date have laid a solid foundation for our success, it is Piedmont's future which I find most exciting. We have several important activities already underway or pending over the coming months, including: …
●       **Permitting** – ***we are actively engaged with local, state and federal regulators in advance of a comprehensive permitting submission targeted for late-2018***;

*       *       *

11

As with any quality resource project, market conditions are critical to the ultimate realization of shareholder value. Lithium pricing has been strong all year, especially for the battery-grade hydroxide markets the Company is targeting. Global electric vehicle demand is up 77% year-over-year and new grid storage applications are also driving lithium demand. Supply growth remains relatively restrained, particularly in the critical lithium hydroxide segment that Piedmont is targeting.

Regrettably, after a strong H2 2017, the market for lithium equities has been disappointing so far in 2018, with shares of lithium developers falling over 40% year-to-date despite lithium chemical prices appreciating. ***This dislocation cannot last, and I believe the supply concerns of some market commentators will be overwhelmed by the commercial realities in coming months, making this an opportune time to be investing in the sector.***

(Emphasis added.)

28.     On October 23, 2018, the Company issued a press release entitled "APPOINTMENT OF LITHIUM INDUSTRY VETERAN TIMOTHY McKENNA AS GOVERNMENT AND PUBLIC RELATIONS ADVISOR" which further touted the Company's plan for proper permits and its government relations, stating and quoting from Defendant Phillips, in relevant part, the following:

- Mr. McKenna has more than 35 years' experience in government and public relations

                              *        *        *

Mr. McKenna has over 35 years' experience in government and public relations roles including a role as vice president of Rockwood Holdings, Inc. in government and investor relations from 2006 until Rockwood's acquisition by Albemarle Corporation.  While with Rockwood, Tim helped create an investor relations and communications program and ***was instrumental in helping Rockwood secure a US$28 million grant from the US Department of Energy to expand operations in North Carolina and Nevada***.

Tim most recently served as vice president US government relations, investor relations, and corporate communications for Lithium X Energy Corp. until its successful acquisition by Nextview New Energy Lion Hong Kong Limited.  Prior to his time in the lithium business, ***Tim held senior government and investor relations roles with Fortune 500 industrial companies Smurfit-Stone Container and Union Camp***.

Keith D. Phillips, President and Chief Executive Officer, commented: "*We are pleased to welcome Tim to our team.  **Tim is a seasoned government and investor relations professional and his 12 years of experience in the lithium sector will help us build strong relationships with regulators and elected officials in North Carolina and at the federal level, where lithium is increasingly viewed as a material that is critical to US energy and national security.***"

(Emphasis added.)

29.      On October 31, 2018, Piedmont filed with the SEC on Form 20-F an annual report for the year ended June 30, 2018 (the "2018 20-F"). Attached to the 2018 20-F were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Phillips and Swan.

30.      The 2018 20-F stated the following, in pertinent part, regarding the Company's progress, plan for proper permits, any potential issues with the lithium market, and government relations:

We plan to effect our business plan by: …

•      completing required permitting and zoning activities required to commence mining and processing operations at the Project[.]

*       *       *

**Permitting**

Our current drilling exploration activities for the Project are authorized under a general permit approved by the North Carolina Department of Environmental Quality DEQ in April 2017. We have reclamation obligations under this permit, as a result of which we will reclaim all disturbed drill pads and temporary roads to the approximate original contours and will seed with grass and straw to stabilize any disturbances. We generally are required to effect such reclamation within 14 days following exploration drilling.

***Prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits authorizing, among other things, any mine development activities and mine operating activities.*** Obtaining and renewing governmental permits is a complex and time-consuming process and involves numerous jurisdictions. public hearings and possibly costly undertakings. ***The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority.*** We may not be

13

able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties. See "Risk Factors—We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming".

**Specialized Skill and Knowledge**

***We rely on specialized skills and knowledge to*** gather, interpret and process geological and geophysical data, ***successfully permit*** and then design, build and operate extraction facilities and numerous additional activities required to extract lithium. ***We expect to employ a strategy of contracting consultants and other service providers to supplement the skills and knowledge of our permanent staff in order to provide the specialized skills and knowledge to undertake our lithium operations effectively.***

(Emphasis added.)

31.     The 2018 20-F even discussed "risks" to the Company with regards to permits, neglecting to inform potential investors that the Company may simply neglect filing timely applications and anger the local population and elected and appointed officials. The 2018 20-F stated the following regarding "risks" with regards to permits and relationships with the local population and elected and appointed officials:

***We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.***

We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. ***The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority.*** We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations. Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key

14

permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities.

Private parties, such as environmental activists, frequently attempt to intervene in the permitting process and to persuade regulators to deny necessary permits or seek to overturn permits that have been issued. Obtaining the necessary governmental permits involves numerous jurisdictions, public hearings and possibly costly undertakings. These third-party actions can materially increase the costs and cause delays in the permitting process and could cause us to not proceed with the development or operation of a property. In addition, our ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on our ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law. Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

(Emphasis added.)

32.      Also on October 31, 2018, Piedmont issued a press release entitled "SEPTEMBER 2018 QUARTERLY REPORT" which stated the following, in pertinent part, regarding the Company's plan for proper permits:

Highlights during and subsequent to the quarter were: …

•      ***Commenced permitting on the Project for all federal, state and local permits, which is targeted for completion in 2019[.]***

           *      *      *

***Next steps:***

•      ***Complete permit applications and secure the necessary permits to commence mining and processing operations at the Project[.]***

(Emphasis added.)

33.      On January 10, 2019, Piedmont issued a press release entitled "PIEDMONT LITHIUM SUBMITS PERMIT APPLICATIONS" which stated the following, in pertinent part,

regarding the Company's progress with and plan for proper permits as well as quoting Defendant

Phillips with regards to government relations:

> Piedmont Lithium Limited ("Piedmont" or "Company") is pleased to announce that it has submitted a Section 404 Standard Individual Permit application to the US Army Corps of Engineers (USACE) for the Company's Piedmont Lithium Project located in the historic Carolina Tin-Spodumene Belt in North Carolina, USA.  The USACE is the lead agency that will review the Company's permit applications at the federal level.
>
> The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources (NCDWR).  The Section 404 and 401 permits are typical requirements for the type of operation proposed by Piedmont Lithium.  HDR Engineering's Charlotte Office acted as lead consultant in the preparation of both applications.
>
> ***These important applications were completed and submitted in accordance with the Company's previously announced estimated permitting timeline (refer to updated Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule.***

| Previously Announced Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | | | | | | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | | | | | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | | | | | | | | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| 404/401 Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| 404/401 Permit Review and Approval Process | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | | | | | | | | |

> ***Piedmont expects to submit the balance of permit applications required to commence mining operations to various state and local agencies within the first half of 2019.***
>
> Keith D. Phillips, President and Chief Executive Officer, commented: *"This application is one more step towards the realization of our goal of producing battery-grade lithium hydroxide in North Carolina.  An immense amount of preparatory work was completed by our team and our consulting advisors, and **we look forward to a continued constructive engagement with the appropriate regulatory bodies**."*

(Emphasis added.)

34.     On January 30, 2019, Piedmont issued a press release entitled "DECEMBER 2018 QUARTERLY REPORT" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

> Highlights during and subsequent to the quarter were: …
>
> •      Submitted key permit applications for the Project, including a Section 404 Standard Individual Permit application to the US Army Corps of Engineers (USACE) and a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources (NCDWR)[.]
>
> *       *       *
>
> *Next steps:*
>
> •      Complete permit applications and secure the necessary permits and approvals to commence mining and processing operations at the Project[.]

35.     On March 6, 2019, Piedmont issued a press release entitled "PIEDMONT COMMENCES NEXT PHASE OF METALLURGICAL TESTWORK" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

> **Appointment of Consultants and Suppliers**
>
> Piedmont recently awarded service agreements to a number of consultants and suppliers to support the Company's efforts to reach a construction decision by the end of 2019: …
>
> •      ***Marshall Miller and Associates (MM&A), a consultancy with deep experience in designing and permitting mines and quarries in North Carolina***, throughout the United States, and globally, has been contracted by Piedmont to provide mining engineering services, waste disposal design engineering, geotechnical study management, and site civil design. …
>
> •      ***Ongoing permitting activities will be managed by Piedmont's lead environmental consultant HDR Engineering.  New services agreements in 2019 have been awarded for traffic studies and additional service agreements are planned for rezoning, community engagement, and mine permit applications.*** …
>
> •      ***Pace Labs has commenced work on waste characterization including analytical work which will be important in the Company's mining permit application and reclamation plans***.

17

(Emphasis added.)

36.     On April 9, 2019, Piedmont issued a press release entitled "PIEDMONT LITHIUM PROJECT DEVELOPMENT UPDATE" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

- **Definitive Feasibility Study and permitting approvals both on-track for year-end 2019**

                                    *       *       *

*The Company remains on schedule to update its Mineral Resource estimate and Scoping Study near mid-year; to receive required permits and regulatory approvals by year-end*; and to complete a Definitive Feasibility Study ("**DFS**") by the end of 2019.

                                    *       *       *

**Technical Studies Underway**

*Marshall Miller has started mine design, sitewide civil design, and waste rock stockpile planning for the Project to support permit activities*, Scoping Study update, and future Definitive Feasibility Study.  These studies are expected to continue throughout 2019 with a planned completion by the end of 2019. Primero Group has commenced design engineering to a PFS-level of accuracy and is scheduled to complete a Scoping Study update in July 2019.  The Scoping Study update will integrate updated Mineral Resources, latest metallurgical testwork, flowsheet optimization and updated costs. …

*Permitting Activities Proceeding as Anticipated*

The public comment period for the Company's Section 404 Standard Individual Permit application to the US Army Corps of Engineers (USACE) concluded in February 2019.  Piedmont has received the comments from USACE and other regulatory agencies and will provide responses by May 31, 2019.  *Piedmont is also proceeding with state and local permit applications.*  The Company will undertake a series of community engagement meetings in the coming months and *anticipates applying for a North Carolina state mining permit and Gaston County conditional zoning in Q3 2019*.

*The federal and state reviews are both proceeding as expected and the Company remains confident that the permitting processes will be successfully concluded by year-end 2019.*

(Emphasis added.)

37.     On April 30, 2019, Piedmont issued a press release entitled "MARCH 2019 QUARTERLY REPORT" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

Highlights during and subsequent to the quarter were: …

- ***Submitted key permit applications for the Project***, including a Section 404 Standard Individual Permit application to the US Army Corps of Engineers ("USACE") and a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources ("NCDWR").

\*          \*          \*

*Next steps:* …

***Complete permit applications and secure the necessary permits and approvals to commence mining and processing operations at the Project[.]***

\*          \*          \*

**Submission of Permit Applications**

During the quarter, the Company submitted a Section 404 Standard Individual Permit application to the US Army Corps of Engineers for the Project.  The USACE is the lead agency that will review the Company's permit applications at the federal level.  The public comment period for these permit applications concluded and the Company received written comments from USACE.  The Company will respond to these comments by May 31, 2019.

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources.  The Section 404 and 401 permits are typical requirements for the type of operation proposed by Piedmont Lithium.  HDR Engineering's Charlotte Office acted as lead consultant in the preparation of both applications.

***These important applications were completed and submitted in accordance with the Company's previously announced estimated permitting timeline (refer to updated Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule.***

\*          \*          \*

19

**Technical Studies Underway**

Marshall Miller has started mine design, sitewide civil design, and waste rock stockpile planning for the Project to support permit activities, Scoping Study update, and future Definitive Feasibility Study. These studies are expected to continue throughout 2019 with a planned completion by the end of 2019. Primero Group has commenced design engineering to a PFS-level of accuracy and is scheduled to complete a Scoping Study update in July 2019. The Scoping Study update will integrate updated Mineral Resources, latest metallurgical testwork, flowsheet optimization and updated costs.

(Emphasis added.)

38.     On June 30, 2019, Piedmont issued a press release entitled "JUNE 2019 QUARTERLY REPORT" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

*Next steps:* …

•       Complete permit applications and secure the necessary permits and approvals to commence mining and processing operations at the Project.

\*        \*        \*

**Technical Studies**

During the quarter, the Company substantially completed engineering work for the upcoming updated Scoping Study to integrate updated Mineral Resources, latest metallurgical testwork, flowsheet optimization and updated costs. The Scoping Study update is expected to be completed within the next 2 weeks.

***Marshall Miller has substantially completed mine design, sitewide civil design, and waste rock stockpile planning for the Project to support permitting activities and the upcoming Scoping Study update.*** Primero Group has substantially completed design engineering to a PFS-level of accuracy for the upcoming Scoping Study update.

(Emphasis added.)

39.     On August 7, 2019, Piedmont issued a press release entitled "UPDATED SCOPING STUDY EXTENDS PROJECT LIFE AND ENHANCES EXCEPTIONAL

20

ECONOMICS" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits and its relationships with the local population and elected and appointed officials:

**Conclusions and Next Steps**

The Scoping Study demonstrates the integrated Project's strong commercial potential, and now puts Piedmont in a strong position to engage in discussions around future financing of the Project, including with prospective strategic and off-take partners. ***The Company will now concentrate on the following initiatives to create additional value in the Project***: …

- ***Secure the necessary permits and approvals for the Mine/Concentrator[.]***

*     *     *

***Waste disposal areas on the Project have been designed to a detail sufficient for permit approvals.*** …



*Figure 5 – Waste rock disposal areas have been designed to sufficient detail for permit applications and approval.*

\*      \*      \*

**Site Plans**

**Mining Operations**

A preliminary integrated site plan including mining operations, waste disposal, and concentrator was developed by Marshall Miller and Primero Group during the course of this Scoping Study. ***The site plan has been developed to a pre-feasibility level of detail and with sufficient definition to acquire permits*** (Figure 11). …



*Figure 11 – Overall Mine/Concentrator Site Plan*

\*      \*      \*

**Environmental and Social Impact Assessment**

HDR Engineering has been retained by Piedmont to support permitting activities on the project.  In December 2018 the Company submitted a Section 404 Standard Individual Permit application to the US Army Corps of Engineers (USACE) for the Project.

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources (NCDWR).  The Section 404 and 401 permits are typical requirements for the type of operation proposed by Piedmont Lithium.

Piedmont has received comments from agencies and the public for these permit applications and provided written responses in Q2 2019.  Approval of both applications is expected within 2019.

*A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months.*

*Background studies undertaken in support of permit applications have been constructive, and the conclusions reached in each individual study to date have met the requirements which would normally support permit approval.*

*       *       *

*Piedmont maintains an active community engagement program including local, state, and federal elected officials, community groups, private individuals, and local media. Community engagement will continue through the permitting, development, and operations phases of the Project.*

(Emphasis added.)

40.     On October 9, 2019, Piedmont issued a press release entitled "PIEDMONT ACCELERATING LITHIUM HYDROXIDE STRATEGY" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

- **Piedmont project to be developed on an integrated basis targeting commissioning in H2 2022**
  o     Mine and concentrator permitting ongoing with federal permits expected in Q4 2019
  o     Lithium hydroxide testwork and chemical plant permitting to commence in Q4 2019

*       *       *

The Company is focused on several important near-term milestones including:

- Key federal permit for the mine and concentrator expected Q4 2019 …
- Integrated definitive feasibility study ("DFS") and chemical plant permitting targeted for Q4 2020

41.     On October 31, 2019, Piedmont issued a press release entitled "SEPTEMBER 2019 QUARTERLY REPORT" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

*Next steps:*

- Complete permitting to commence mining and processing operations at the Project;
- Commence permitting for the chemical plant in Q4 2019[.]

42.    On November 26, 2019, Piedmont issued a press release entitled "PIEDMONT LITHIUM RECEIVES FEDERAL PERMIT TO DEVELOP MINE" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: *"Securing a Section 404 Individual Permit is a major milestone for any natural resource project in the United States, and we are very pleased to have received this authorization. I want to thank our team members and advisors who have worked so diligently and cooperatively throughout this rigorous process, and also express our thanks to the Army Corps of Engineers for the highly professional manner in which they have approached this Project from day one.* We will now move forward with the permitting of our chemical plant operations during 2020. *Our project is unique in being the only spodumene-to-hydroxide project in the United States, and **now also stands out as the most advanced American lithium project from a permitting perspective. We are very excited about the important milestones ahead of us as we look to deliver a DFS for a fully permitted integrated project by the end of 2020***."

(Emphasis added.)

43.    On December 4, 2019, Piedmont issued a press release entitled "HATCH APPOINTED TO DELIVER PFS FOR PIEDMONT'S LITHIUM HYDROXIDE PROJECT IN NORTH CAROLINA" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: *"We are very pleased to be working with Hatch on the PFS for our lithium hydroxide project. Hatch has unsurpassed lithium processing experience, having studied directly comparable projects for several clients. **Having recently received a landmark permit for our mine/concentrator we are moving full-speed ahead to having a shovel-ready project by the end of 2020.**"*

(Emphasis added.)

24

44.    On February 26, 2020, Piedmont issued a press release entitled "HYDROXIDE TESTWORK PROGRAM PROCEEDING FAVORABLY" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: *"We are very encouraged by the positive results generated thus far in the lithium hydroxide testwork program, and expect the final results to be announced in the near future. The optimization tests performed by SGS will allow us to refine the proposed Chemical Plant flowsheet and will underpin the prefeasibility study targeted for completion in Q2 2020. Completion of the PFS, **along with continued advances on the permitting and offtake fronts, position us to advance our Project to shovel-ready status by the end of the year, well-timed for the recovery in lithium prices and market sentiment that many observers are forecasting for the remainder of this year**."*

(Emphasis added.)

45.    On March 18, 2020, Defendant Phillips released a letter to shareholders which stated the following, in relevant part, regarding the lithium market and the Company's progress with and plan for proper permits:

> In this time of market volatility surrounding the coronavirus pandemic, I wanted to provide a brief update on current activities at Piedmont Lithium Limited ("Piedmont") as well as our plans going forward. …
>
> *            *            *
>
> I would like to make a final comment on lithium market dynamics. While uncertainly exists with respect to the duration of the current economic slowdown, ***it is increasingly clear that the future is bright for the lithium business, particularly in the United States***. …
>
> ***In short, the future of Piedmont is bright and we anticipate positive developments in coming weeks and months.***

(Emphasis added.)

46.    On January 11, 2021, Piedmont issued a press release entitled "PIEDMONT LITHIUM ANNOUNCES STRATEGIC INVESTMENT IN QUEBEC HARD-ROCK LITHIUM

DEVELOPER SAYONA MINING" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> "This is a very exciting step for Piedmont. ... **2021 will be an important year for our Piedmont Lithium Project, as we plan to** expand our mineral resources, **finalize permitting**, execute additional lithium offtake agreements, complete an integrated definitive feasibility study, and secure strategic project financing. We are fortunate to have a strong balance sheet to comfortably fund the Sayona investments **without compromising our aggressive plans in North Carolina**."

(Emphasis added.)

47.     On January 29, 2021, Piedmont issued a press release entitled "DECEMBER 2020 QUARTERLY REPORT" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> "Following our highly successful equity offering in October, **Piedmont enters 2021 with a strong balance sheet that will enable the Company to meet its development objectives for the coming year. Our expanded team continues to do a great job on the ground in North Carolina** in mineral exploration, metallurgical testwork, technical studies, **and permitting that may make it possible for Piedmont to begin construction of our project by the end of this year**. We expect 2021 will be a pivotal year for Piedmont Lithium, and we are excited about the months ahead."

(Emphasis added.)

48.     On April 30, 2021, Piedmont issued a press release entitled "MARCH 2021 QUARTERLY REPORT" which stated the following, in pertinent part, regarding the Company's purported efforts with relationships with the local population and elected and appointed officials:

> Highlights during and subsequent to the quarter were: …
>
> **Expanded the Company's senior management team through the addition of Ms. Malissa Gordon – Community and Government Relations**, Mr. Jim Nottingham – Senior Project Manager Concentrate Operations, Mr. Pratt Ray – Production Manager – Chemical Operations, Mr. Brian Risinger – Vice President Corporate Communications, and Mr. Bruce Czachor – Vice President and General Counsel[.]

(Emphasis added.)

49.     The statements referenced in ¶¶18-48 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Piedmont has not, and would not, follow its stated steps or timeline to secure all proper and necessary permits; (2) Piedmont failed to inform relevant people and governmental authorities of its actual plans; (3) Piedmont failed to file proper applications with relevant governmental authorities (including state and local authorities); (4) Piedmont and its lithium business does not have "strong local government support"; and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Emerges

50.     On July 20, 2021, before market hours, *Reuters* published an article entitled "In push to supply Tesla, Piedmont Lithium irks North Carolina neighbors" which reported the following, in pertinent part, regarding the Company's regulatory issues in North Carolina:

> In its quest to build one of the largest lithium mines in the United States, Piedmont Lithium Inc has overlooked one crucial constituency: its North Carolina neighbors.
>
> Piedmont last autumn signed a deal to supply U.S. electric automaker Tesla Inc with lithium sourced from its deposits in North Carolina, sending the company's stock up tenfold.
>
> *              *              *
>
> ***The company, however, has not applied for a state mining permit or a necessary zoning variance in Gaston County, just west of Charlotte, despite telling investors since 2018 that it was on the verge of doing so.***
>
> ***Five of the seven members of the county's board of commissioners, who control zoning changes, say they may block or delay the project*** because Piedmont has not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected. …

***"Piedmont has sort of put the proverbial cart before the horse," said Tom Keigher, chair of the board of commissioners.*** "Why in the world would they make this deal with Tesla before they even have approval for the mine?"

\*        \*        \*

***The deteriorating relationship between Piedmont and county leaders*** reflects broader tension in the United States as resistance to living near a mine clashes with the potential of EVs to mitigate climate change. …

The company originally planned to put its chemical plant in a neighboring county, but now intends to build it near the mine, a step that should reduce truck traffic. Piedmont also plans to crush rock in the mine pit, alleviating dust, and incorporate solar power.

\*        \*        \*

***In September 2018, Piedmont told investors it expected to obtain permits by the end of 2019. In August 2019, executives said they would apply for permits and rezoning "in the coming months."***

***Piedmont said both times it was "not aware" of any reason why the county would not approve zoning changes, even though it had yet to present any information to commissioners. In December, Piedmont said it expected to receive local zoning approval before the end of June.*** …

***Piedmont had been set to meet with commissioners in March, but canceled with three days' notice, further straining the relationship.*** Piedmont said it canceled that meeting in order to further refine its plans.

"This has been the worst rollout of a project from a company I've ever seen," said Chad Brown, a commissioner who opposes the mine.

\*        \*        \*

Tesla, which has other lithium suppliers, did not respond to requests for comment.

The North Carolina Department of Environmental Quality, which issues mining permits, said it expects an application "in the near future."

State officials added their review process could stretch for more than a year as they solicit comments from at least six other state and federal agencies.

***"I'm not even going to accept an application from Piedmont for rezoning until they have their state permit in hand," said Brian Sciba, director of Gaston County's planning and zoning office.***

28

\*      \*      \*

While some landowners are prepared to sell if the offer is enticing enough, others say Piedmont has bullied them.

"They told me that if I don't sell, they'll just mine around my property," said Emilie Nelson, whose 14 acres Piedmont has tried to buy since 2017.

Piedmont said it was unaware if one of its contractors made the alleged threat, but did not authorize or condone it.

"We always deal respectfully with folks," said Patrick Brindle, Piedmont's vice president of project management.

(Emphasis added.)

51.     On this news, Piedmont shares fell $12.56 per share over the trading day, or nearly 20%, to close at $50.52 per share on July 20, 2021, damaging investors.

52.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Piedmont during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

59.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

60.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64. During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65. The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

66. The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

67. The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

68.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

69.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

70.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

71.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

72.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

74.     As an officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

75.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

76.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the

35

unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 23, 2021                         Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             Phillip Kim, Esq. (PK 9384)
                                             Laurence M. Rosen, Esq. (LR 5733)
                                             275 Madison Ave., 40th Floor
                                             New York, NY 10016
                                             Tel: (212) 686-1060
                                             Fax: (212) 202-3827
                                             Email: lrosen@rosenlegal.com
                                             Email: pkim@rosenlegal.com

                                             *Counsel for Plaintiff*