UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————— x

In re PIEDMONT LITHIUM INC.
SECURITIES LITIGATION

———————————————————————

: Civil Action No. 1:21-cv-04161-LDH-PK
:
: CLASS ACTION
:
: **AMENDED CLASS ACTION**
: **COMPLAINT FOR VIOLATIONS OF**
: **THE FEDERAL SECURITIES LAWS**

—————————————————————— x

Lead Plaintiff Ace Association LLC ("Lead Plaintiff" or "Plaintiff"), by its undersigned attorneys, makes the allegations set forth herein based upon knowledge as to its own acts and upon the investigation conducted by Plaintiff's counsel. That investigation included the examination and analysis of information obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings by Piedmont Lithium Inc. f/k/a/ Piedmont Lithium Limited ("Piedmont" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with government permitting and/or zoning personnel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the publicly traded securities of Piedmont between June 14, 2018 and July 19, 2021, both dates inclusive (the "Class Period") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Defendant Piedmont is an early stage project company focused on developing an integrated lithium business. The Company's core asset, and centerpiece of its operations, is its wholly-owned interest in a lithium project located in Gaston County, North Carolina, in an area that has historically produced much of the western world's lithium (the "Carolina Lithium Project" or "Project"). At the start of the Class Period, the Company was exclusively focused on proving the Project's potential.

3.     Through the Project, the Company planned to build: (i) an open-pit mine; (ii) a spodumene[1] concentrator;[2] and (iii) a chemical plant to convert the spodumene mineral found in the region into lithium hydroxide, an important input in electric vehicle manufacturing.

4.     Before embarking on the Project, the Company first needed to obtain required federal, state and local permits and a zoning variance.  Of particular importance to this lawsuit, this included both the North Carolina state mining permit to operate the mine, and zoning approval from the Gaston County Board of Commissioners (the "Commissioners") for the mine and concentrator property.  Without the required permits and zoning variance, the Project could not go forward.

5.     Throughout the Class Period, Defendants (defined below) issued numerous materially false and misleading statements and omitted to disclose material facts regarding the Project, including that: (i) the Company had strong local government support for the Project; (ii) the Company was actively engaged in discussions with relevant authorities regarding the zoning changes that needed to be made for the Project; and (iii) the Company would file for the necessary North Carolina state mining permit and zoning variance in its stated timelines, which Defendants often indicated they were mere months away from doing.

6.     In other words, investors were led to believe that the Company had met with the Commissioners, had their support, and would have no major issues rezoning the property for its planned use.  Moreover, by stating that the Company was mere months away from applying for a state mining permit and rezoning variance, Defendants led investors to wrongly believe that the

_____

[1]     Spodumene is a mineral that contains lithium.  Due to its high lithium content, spodumene is considered the most important lithium ore mineral and is a source material for battery production.

[2]     A concentrator is a facility which processes ore mineral transported from a mine and removes most of the valuable mineral and discards most of the barren portion as tailings.

Company had a detailed plan in place to obtain the necessary permits and variance and was on track with its stated timelines. Unbeknownst to investors, none of this was true.

7.     Without disclosing the true state of affairs regarding the Project, Defendants raised approximately $193 million for the Company through various public equity offerings, which was used for strategic investments in other projects, among other things. They also reached an agreement with Tesla, Inc. ("Tesla") to supply it with spodumene concentrate.

8.     On July 5-6, 2021, just two weeks before Defendant Phillips (defined below) and Patrick Brindle ("Brindle"), the Project Manager, were set to make the Company's public presentation before the Commissioners on July 20, 2021, both Phillips and Brindle completed their first reported sales of Piedmont stock, selling approximately $3.46 million worth of their personally-held Piedmont stock to the investing public at prices close to Class Period highs.

9.     On July 20, 2021, before the markets opened, Piedmont investors were surprised when a *Reuters* article[3] revealed – for the first time – that: (i) the Commissioners had not previously been spoken with by Piedmont, or presented with any information, about the Project; (ii) the Project did not benefit from strong local government support; (iii) five out of seven Commissioners, ***who control zoning changes***, stated they may block or delay the Project because Piedmont has not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected; (iv) the Company had not yet applied for a state mining permit or a zoning variance in Gaston County; and (v) the Company's state mining permit and rezoning application timelines were unrealistic and lacking in any basis because the Company had yet to meet with the Commissioners and discuss it with them. Thus, far from the "[s]trong local government support" the Company

---

[3] Ernest Scheyder, *In push to supply Tesla, Piedmont Lithium irks North Carolina neighbors*, REUTERS (July 20, 2021), https://www.reuters.com/business/energy/push-supply-tesla-piedmont-lithium-irks-north-carolina-neighbors-2021-07-20/.

touted, one of the Commissioners clarified: "***This has been the worst rollout of a project from a company I've ever seen***."

10.     The *Reuters* article included a quote from Defendant Phillips, dismantling the notion that the Company was actively engaged with the Commissioners or that its state mining permit and rezoning application timelines were ever feasible: "Maybe it would have been better had (commissioners) been in the loop constantly.  We didn't really have the time or resources to do it and ***we didn't even know what to tell them***[.]"  Scheyder, *supra* n.3.  And, as later confirmed during the Company's presentation that evening, the Commissioners had been "***completely left in the dark***."

11.     Importantly, the *Reuters* article also stated that the Company needed to have its state mining permit "***in hand***" before it could apply for rezoning – a death knell to the Company's rezoning application timelines since the state mining permit review process could "stretch for more than a year" – and the Company had still not filed the application.  Scheyder, *supra* n.3.

12.     In response to this news, the price of Piedmont stock fell $12.56 per share over the trading day, plummeting nearly 20%, to close at $50.52 per share on July 20, 2021.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

16.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the NASDAQ Market ("NASDAQ"), a national securities market.

**PARTIES**

17.     Lead Plaintiff Ace Association LLC purchased Piedmont securities during the Class Period, as set forth in its certification previously filed with the Court (ECF No. 18-2) and incorporated herein by reference, and has been damaged thereby.

18.     Defendant Piedmont engages in the exploration and development of resource projects. Of particular note, the Company primarily holds a 100% interest in a lithium project covering over 2,322 acres in North Carolina.  Defendant Piedmont is incorporated in Delaware and maintains its principal executive offices at 32 North Main Street, Suite 100, Belmont, NC 28012.  During the Class Period, Piedmont securities were listed on the NASDAQ under the ticker symbol "PLL."  On or about October 11, 2017, Piedmont American Depositary Shares ("ADSs") began trading on the OTC Market as a member of the NASDAQ International Designation under the ticker symbol "PLLLY."  On or about May 7, 2018, Piedmont ADSs began trading on the NASDAQ and, until December 2018, were listed on the NASDAQ under the ticker symbol "PLLL."  Each ADS represented 100 ordinary shares in the Company.  On or about May 17, 2021, in connection with Piedmont's redomiciliation from Australia to the United States, Piedmont's ADS holders received one share of Piedmont common stock for each ADS.

19.     Defendant Keith D. Phillips ("Phillips") served as the Company's President and Chief Executive Officer throughout the Class Period.  Defendant Phillips previously spent 30 years as an investment banker on Wall Street, during which time he worked on strategic and financing

transactions representing over $100 billion in aggregate value. He also has experience leading mining investment banking teams and has worked with numerous mining companies.

20. Defendant Bruce Czachor ("Czachor") served as the Company's Vice President and General Counsel during the Class Period. Defendant Czachor has over 34 years of experience in general corporate matters, corporate governance, capital markets, bank finance, mergers and acquisitions, joint ventures, licensing agreements and commercial transactions, and was a partner at major law firms.

21. Defendants Phillips and Czachor are collectively referred to herein as the "Individual Defendants." Piedmont and the Individual Defendants are collectively referred to herein as the "Defendants."

22. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Piedmont, were privy to confidential and proprietary information concerning Piedmont and its operations, finances, financial condition, and present and future business prospects. As discussed below, the Individual Defendants had access to material, adverse, non-public information concerning Piedmont via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the

Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Piedmont's business.

24. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

25. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Piedmont's financial condition and performance, growth, operations, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Piedmont securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26. Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Piedmont securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived

the investing public regarding Piedmont's business and prospects and the intrinsic value of Piedmont securities; (ii) enabled the Defendants to raise funds in multiple public equity offerings at artificially inflated prices and to use those funds to make strategic investments; (iii) enabled Defendant Phillips and Patrick Brindle, the Project Manager and Chief Development Officer, to sell approximately $3.46 million worth of Piedmont securities to the unsuspecting public at artificially inflated prices at times and in amounts that were unusual; (iv) enabled the Company to enter into a supply agreement with Tesla; and (v) caused Lead Plaintiff and other members of the Class (defined below) to purchase Piedmont securities at artificially inflated prices.

27.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Overview of the Company and the Carolina Lithium Project

29.     Defendant Piedmont is a pre-revenue, early stage project company focused on developing an integrated lithium business.  The centerpiece, and core asset, of Piedmont's operations is its wholly-owned interest in a lithium project located within the Carolina Tin-Spodumene Belt and along trend to the Hallman Beam and Kings Mountain mines.  This area historically produced much of the western world's lithium between the 1950s and 1990s.

30.     Piedmont secured the exploration rights and initial land position in mid-2016.  At the start of the Class Period, Piedmont was exclusively focused on proving the Carolina Lithium Project's potential.

31.     Piedmont's business plan involved using the spodumene mineral found in the region to make spodumene concentrate ("SC6") that could then be converted into lithium hydroxide, a critical component for electric vehicle manufacturing.  Specifically, this process would be completed in one integrated location in Gaston County, North Carolina, through the use of a lithium hydroxide chemical plant supplied with spodumene concentrate from an open-pit mine and concentrator.

**Piedmont Needed to Complete Necessary Permitting and Zoning Activities**

32.     To effectuate its business plan, the Company needed to complete various steps, which included, among other things, the following:

(a)     completing exploration drilling on its initial land position and securing additional land leases for further exploration;

(b)     undertaking necessary technical studies to assess the economic potential of the Carolina Lithium Project;

(c)     completing required permitting and zoning activities;

(d)     completing required financing activities;

(e)     completing construction of Piedmont's lithium mining and processing activities; and

(f)     beginning lithium mining and processing activities to supply electric vehicle and battery storage markets.

33.     On March 16, 2018, in a registration statement filed with the SEC on Form 20-F, the Company acknowledged that "[p]rior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits authorizing, among other things, any mine development activities and mine operating activities."  The Company understood that its "ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations

will likely depend on [its] ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities."

34.     Thus, as recognized and represented by Defendants, one of the necessary conditions for Piedmont to successfully commercialize its business plan was for it to secure the required permits, and complete rezoning activities.  Put another way, the Company would not be able to engage in lithium mining and processing activities unless it: (i) obtained the required permits; and (ii) completed the required rezoning activities.

35.     By the start of the Class Period, the Company had received a general permit from the North Carolina Department of Environmental Quality ("DEQ") for drilling exploration activities for the Project.

36.     To support permitting activities on the Project, the Company retained HDR Engineering.  As represented to investors in the Company's Form 6-K filed on July 19, 2018, HDR Engineering completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits that the Company would need to commence mining and concentrator activities.  ***Thus, by the start of the Class Period, Defendants knew which local, state, and federal permits and rezoning activities they were required to obtain and/or receive approval for in order to commence Piedmont's mining and concentrator activities for lithium in North Carolina***.

## The North Carolina State Mining Permit

37.     Among the necessary permitting activities was the North Carolina state mining permit from the North Carolina DEQ Division of Energy, Mineral, and Land Resources.  Pursuant to G.S. §74-50 of the North Carolina Mining Act of 1971 ("NC Mining Act" or, the "Act"), a mining operator must obtain an operating permit covering the affected land in order to engage in mining in that area.  G.S. §74-51 of the Act requires the prospective operator to submit an application

containing information regarding operation of the mine and a reclamation plan meeting the requirements of G.S. §74-53 for the restoration of all affected land once mining is complete. A permit will not be issued until a reclamation plan has been approved.

38.     Information required in the permit application includes: materials to be mined, method of mining, expected depth of the mine, size of the mine, intended plan for overall mine reclamation, and mine maps showing property lines of the tract or tracts of land on which the proposed mining activity is to be located, existing or proposed permit boundaries with geographic controls labeled, outline and acreage of all pits/excavations, and outline and acreage of all stockpile areas.

39.     The current state mining permit application also includes the following note on the first page of the application: "It is recommended that you contact the appropriate Regional Office or the Raleigh Central Office for a PRE-APPLICATION MEETING to discuss your intentions and address any questions."  (Emphasis in original.)

40.     The state mining permit review process includes the solicitation of comments from at least six other state and federal agencies and may also include additional requests for information. Additionally, if it is determined that significant public interest exists, a public hearing on the application for a mining permit will be held before a final decision is made on the application and the DEQ must give full consideration to all comments submitted at the public hearing.

41.     G.S. §74-65 of the Act cautions that no provision shall be construed to supersede or otherwise affect or prevent the enforcement of any zoning regulation that is not in direct conflict with the Act.  Pursuant to a 2017 amendment, any newly issued mining permit is to be issued for the life of the site or lease term.

42.     The necessary zoning activities for development of the mine included obtaining approval for a variance from the Gaston County Board of Commissioners for rezoning the Project's mine and concentrator property.

43.     The Board of Commissioners is the governing body for Gaston County's unincorporated areas and ***makes the final decision for all rezoning cases***.   In 1977, the Commissioners, by ordinance, created the Gaston County Planning Board ("Planning Board"), which may make recommendations on rezoning cases to the Commissioners, although final say remains with the Commissioners.   Pursuant to Section 4.2 of the Gaston County Unified Development Ordinance ("UDO"), the Commissioners have the power to, among other things: appoint members to the Planning Board and Gaston County Board of Adjustment; initiate amendments to the UDO; review recommendations of the Planning Board; and make final decisions on applications for amendments to the UDO.

44.     Pursuant to Section 6.5 of the UDO, the Conditional District zoning process allows for the establishment of specific uses that, because of their nature or scale, have particular impacts on both the immediate area and the community as a whole.   The rezoning of any parcel of land to a Conditional District must be in compliance with all other plans and regulations adopted by the Commissioners.   According to the UDO at Sections 6.5 and 5.16.5, the development of these uses cannot be predetermined or controlled by general district standards and a Conditional District zoning application should be interpreted to be applicable in all underlying zoning districts and regulated uses where permitted by right or by special use permit.

45.     The Conditional District rezoning review process outlined in Section 5.16.5 of the UDO includes the opportunity for the Planning Board to review and make a recommendation on the application.  If the Planning Board does not make a recommendation, the application is forwarded to

the Commissioners without one. The Commissioners then have the ability to approve the application, deny the application, approve the application with modifications mutually agreed to by the applicant and the Commissioners, or submit the application to the Planning Board for further study and to make a report to the Commissioners.

46.     As Defendant Phillips later stated: ***"We've known from day one, we can't do anything without [the Commissioners] rezoning this property – full stop."*** And ***"[w]e can't do anything without . . . receiving a North Carolina state mining permit – we've known that all along."*** (Emphasis added.)

### Piedmont Represents that It Benefits from Strong Local Government Support; Plans to Submit the State Mining Permit Application by April 2019

47.     At the start of the Class Period, on June 14, 2018, Defendants began to issue positive statements about the Project to assure investors that the Project had the necessary local government support, which was critical for approval of the Project. To that end, in a press release issued that day, the Company discussed its strategic North Carolina location, stating that it will benefit from "***[s]trong local government support***." (Emphasis added.)

48.     Defendants also provided a timeline for the filing of its permits and other required approvals. For example, on July 19, 2018, the Company represented that the state mining permit application would be submitted by April 2019. Defendants reaffirmed this timeline in a September 13, 2018 press release.

49.     Also on September 13, 2018, Defendants informed investors that the Project's planned mine and concentrator property would need to be rezoned from agricultural use to industrial use "prior to a construction decision." While Defendants told investors that the Company "held initial meetings with the Gaston County planning office and the Economic Development Commission of Gaston County" and that they were "not aware" of any reason why rezoning would

not be granted, Defendants omitted to disclose that they had not yet discussed with, or presented any of their plans to, the Commissioners – *i.e.*, the final rezoning decision makers for all rezoning cases.

50.     In subsequent positive Class Period statements, Defendants further highlighted the stage of permitting and approvals for the Project and their engagement with local, state and federal regulators.  Again, no disclosure was made that they had yet to discuss their plans with, or present them to, the Commissioners.

**Piedmont Announces that the State Mining Permit and**
**Rezoning Applications Will Be Submitted in the Coming Months**

51.     Throughout the Class Period, Defendants repeatedly provided a timeline for the overall project development and the filing of the all-important state mining permit.  For example, in August 2019, Defendants represented that a "mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months."

52.     Defendants again represented in early 2020 that "the future of Piedmont is bright and we anticipate positive developments in the coming weeks and months" and that "[p]ermitting activities for the Mine/Concentrator are well advanced" and a "mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months."

53.     Defendants did not disclose that they had not yet met with or discussed their plans with, the Commissioners such that they had no good faith basis or reasonable belief to provide the stated timelines.  Indeed, as investors ultimately learned: (i) the Company could not submit its rezoning application until it first had the state mining permit in hand; (ii) the state mining review process could stretch for more than a year; and (iii) the Company had not yet submitted the state mining application.

**Piedmont Completes Multiple Public Equity Offerings
and Enters Into an Agreement with Tesla**

54.     Prior to the disclosure of any adverse information regarding the Project, Defendants took advantage of the artificial inflation in the price of the Company's stock and completed several public equity offerings.

55.     On June 11, 2020, Piedmont completed a public equity offering through a shelf-registration statement filed with the SEC on Form F-3 and a final prospectus filed with the SEC on Form 424B5 on June 9, 2020, which incorporated by reference certain other filed documents (the "June 2020 Registration Statement"), pursuant to which the Company sold 2,065,000 ADSs to the public at $6.30 per ADS (the "June 2020 Offering").  The June 2020 Offering generated aggregate gross proceeds totaling approximately US$13.0 million.  The Company stated that it intended to use the net proceeds from the June 2020 Offering to continue development of the Carolina Lithium Project, including permitting.

56.     The Company's positive assessment of the Project's progress caught the attention of others as well.  For example, on September 28, 2020, Piedmont announced that an agreement was reached to supply Tesla with spodumene concentrate, conditional upon Piedmont and Tesla agreeing to a start date for SC6 deliveries between July 2022 and July 2023.  The agreement called for an initial five-year term, with an option for a second five-year term by mutual agreement.  Defendant Phillips commented: "We will now accelerate our mine/concentrator development to support Tesla's plans[.]"

57.     On October 23, 2020, the Company completed another public equity offering through a shelf-registration statement filed with the SEC on Form F-3 and a final prospectus filed with the SEC on Form 424B5 on October 22, 2020, which incorporated by reference certain other filed documents (the "October 2020 Registration Statement"), pursuant to which the Company sold 2.3

million ADSs to the public for $25.00 per ADS (the "October 2020 Offering"). The October 2020 Offering generated aggregate gross proceeds of $57.5 million. The Company stated that it intended to use the net proceeds from the October 2020 Offering to continue development of the Carolina Lithium Project, including permitting.

58.     On March 25, 2021, Piedmont completed another public equity offering through a shelf-registration statement filed with the SEC on Form F-3 and a final prospectus filed with the SEC on Form 424B5 on March 24, 2021, which incorporated by reference certain other filed documents (the "March 2021 Registration Statement" and together with the June 2020 Registration Statement and October 2020 Registration Statement, the "Registration Statements"), pursuant to which the Company sold 1.75 million ADSs to the public at $70.00 per ADS (the "March 2021 Offering"). The March 2021 Offering generated $122.5 million in aggregate gross proceeds. The Company stated that the net proceeds from the March 2021 Offering would be used to, among other things, continue development of the Carolina Lithium Project, including permitting.

**The Truth Is Revealed**

59.     On July 20, 2021, before market hours, *Reuters* published an article entitled "In push to supply Tesla, Piedmont Lithium irks North Carolina neighbors" which reported – for the first time – that Piedmont had not previously spoken with or consulted the Commissioners about the required zoning variance and the Project. Specifically, *Reuters* reported that:

> In its quest to build one of the largest lithium mines in the United States, Piedmont Lithium Inc has overlooked one crucial constituency: its North Carolina neighbors.
>
> Piedmont last autumn signed a deal to supply U.S. electric automaker Tesla Inc with lithium sourced from its deposits in North Carolina, sending the company's stock up tenfold.

<p style="text-align:center">*     *     *</p>

*The company, however, has not applied for a state mining permit or a necessary zoning variance in Gaston County, just west of Charlotte, despite telling investors since 2018 that it was on the verge of doing so.*

*Five of the seven members of the county's board of commissioners, who control zoning changes, say they may block or delay the project because Piedmont* has not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected.

*"Piedmont has sort of put the proverbial cart before the horse," said Tom Keigher, chair of the board of commissioners.* "Why in the world would they make this deal with Tesla before they even have approval for the mine?"… "We finally have a project to debut and really talk about," said Keith Phillips, Piedmont's chief executive officer.

*"Maybe it would have been better had (commissioners) been in the loop constantly. We didn't really have the time or resources to do it and we didn't even know what to tell them, until now."* The deteriorating relationship between Piedmont and county leaders reflects broader tension in the United States as resistance to living near a mine clashes with the potential of EVs to mitigate climate change.…

The company originally planned to put its chemical plant in a neighboring county, but now intends to build it near the mine, a step that should reduce truck traffic. Piedmont also plans to crush rock in the mine pit, alleviating dust, and incorporate solar power.

\* \* \*

*In September 2018, Piedmont told investors it expected to obtain permits by the end of 2019. In August 2019, executives said they would apply for permits and rezoning "in the coming months."*

*Piedmont said both times it was "not aware" of any reason why the county would not approve zoning changes, even though it had yet to present any information to commissioners. In December, Piedmont said it expected to receive local zoning approval before the end of June.…*

*Piedmont had been set to meet with commissioners in March, but canceled with three days' notice, further straining the relationship.* Piedmont said it canceled that meeting in order to further refine its plans.

*"This has been the worst rollout of a project from a company I've ever seen,"* said Chad Brown, a commissioner who opposes the mine.

\* \* \*

The North Carolina Department of Environmental Quality, which issues mining permits, said it expects an application "in the near future."

*State officials added their review process could stretch for more than a year as they solicit comments from at least six other state and federal agencies.*

"***I'm not even going to accept an application from Piedmont for rezoning until they have their state permit in hand,*** *" said Brian Sciba, director of Gaston County's planning and zoning office.*

<div align="center">*       *       *</div>

While some landowners are prepared to sell if the offer is enticing enough, others say Piedmont has bullied them.

"They told me that if I don't sell, they'll just mine around my property," said Emilie Nelson, whose 14 acres Piedmont has tried to buy since 2017.

Piedmont said it was unaware if one of its contractors made the alleged threat, but did not authorize or condone it.

"We always deal respectfully with folks," said Patrick Brindle, Piedmont's vice president of project management....

Landowners said they would prefer Piedmont only build a processing plant and rely on a foreign mine for lithium supply. Livent Corp (LTHM.N) and Albemarle Corp (ALB.N) operate lithium processing plants in the county that source the metal from South America.

Piedmont, which recently bought stakes in Quebec and Ghana lithium projects, said it prefers to mine and process the metal at the Gaston County site.

Piedmont's arrangement with Tesla has done little to impress locals. More than 1,500 have signed a petition asking officials to block the mine. "There's no doubt the mine would benefit our country and the green energy industry," said Tracy Philbeck, a commissioner. "***But it would have a negative impact on our community.***"

Scheyder, *supra* n.3. (Emphasis added.)

60.     In response to this news, the price of Piedmont stock fell $12.56 per share over the trading day, or nearly 20%, to close at $50.52 per share on July 20, 2021, damaging investors.

61.     Later that evening, on the same date the *Reuters* article was published, Piedmont finally presented the Project to the Commissioners – its first time doing so, and after cancelling the prior scheduled March 9, 2021 presentation on three days' notice. Scheyder, *supra* n.3.

62.     During the presentation, Defendant Phillips confirmed: "We've known from day one, we can't do anything without [the Commissioners] rezoning this property – full stop." And "[w]e can't do anything without . . . receiving a North Carolina state mining permit – we've known that all along."

63.     Defendant Phillips conceded: ***"we weren't ready to present in March. We didn't know our plans and very important components that are now part of our plan weren't finalized then[.]"*** Indeed, Defendant Phillips admitted: ***"we haven't done as good a job – and I blame myself – with the community, the Commissioners, et cetera[.]"*** (Emphasis added.)

64.     In response, Commissioner Tracy Philbeck remarked:

> ***I do think the rollout of this as far as grassroots level, to put it politely, has not been good. I think you've missed an opportunity there and I think you're going to have to work from behind.*** I think it's going to be much easier to get $840 million [the estimated total capital investment for the Project] than I think it's going to be to get community support. . . So, I'm a little disappointed in that. ***I cannot stress enough how big of an opportunity I think has been missed there. And in my [soon-to-be] 14 years . . . on the board, out of all the companies we've dealt with from all around the world and in America, no company that I've ever dealt with has . . . left such a bad taste in our citizens' mouths and even the Commission to start out with.*** . . I think that it's going to be a very high bar – and it will all be to null – if you can't get over that.

(Emphasis added.)

65.     Commissioner Philbeck went on to confirm: "***we've been completely left in the dark.***" (Emphasis added.)

66.     Following these disclosures, an Evercore ISI analyst report dated July 21, 2021 shared the disappointment: "The miss here, in our view, was that [Piedmont] . . . had not previously engaged with county commissioners on the project / benefits etc." The report further noted that "[t]he zoning is crucial for the project to proceed" and declared that "the 'honeymoon' is over[.]"

**MATERIALLY FALSE AND MISLEADING STATEMENTS
MADE DURING THE CLASS PERIOD**

**Statements Regarding the Company's Relationships with the
Commissioners and Local Population Were Materially False and Misleading**

67.     The Class Period begins on June 14, 2018.  On that date, the Company issued a press release entitled "Piedmont Lithium Announces Maiden Mineral Resource," in which it stated that the North Carolina Project will benefit from "*[s]trong local government support*."  (Emphasis added.)

68.     The statement referenced in ¶67 above was materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose, that Piedmont and the Carolina Lithium Project did not have "*Strong local government support*."  As investors later learned, Piedmont had not consulted the Gaston County Commissioners before this statement was made nor provided them with details of their plans, including the levels of dust, noise and vibrations that were expected to occur, or how water and air quality were expected to be affected.  Indeed, as Defendant Phillips later conceded: "*We've known from day one*, we can't do anything without [the Commissioners] rezoning this property" and "*we haven't done as good a job – and I blame myself – with the community, the Commissioners, et cetera*[.]"  Further, this statement was later revealed to be false as five out of the seven Commissioners stated they may block or delay the Project, with one underscoring: "*This has been the worst rollout of a project from a company I've ever seen*."  Thus, Defendants had no basis to claim that the Project benefitted from "*Strong local government support*."

69.     On September 13, 2018, the Company issued a press release entitled "Updated Scoping Study Improves Project Economics" which stated, in pertinent part, the following:

> *A rezoning of the Project's Mine/Concentrator property from agricultural use to industrial use will be required prior to a construction decision.  Additionally, a Conditional Use Permit (CUP) issued by Gaston County will be required.  The Company has held initial meetings with the Gaston County planning office and the*

***Economic Development Commission of Gaston County. The Company is not aware of any reason why rezoning and a CUP would not be granted.***

70.     The statements referenced in ¶69 above were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose, that they did not consult, or plan to consult, the Commissioners – the regulatory body that controls, and has final say over, the crucial zoning decisions referenced above.  As investors later learned, at the time these statements were made, Piedmont had not consulted the Gaston County Commissioners nor provided them with details of their plans, including the levels of dust, noise and vibrations that were expected to occur, or how water and air quality were expected to be affected.  Indeed, as Defendant Phillips later conceded: "***We've known from day one***, we can't do anything without [the Commissioners] rezoning this property" and "***we haven't done as good a job – and I blame myself – with the community, the Commissioners, et cetera***[.]"  Additionally, as Defendant Phillips later admitted, the Company did not sufficiently know the details of its plans in order to present them to the Commissioners until July 2021, nearly three years after these statements were made.  Thus, the Company had no basis to claim at this point that it was "not aware" of any reason why rezoning would not be granted.

71.     On September 26, 2018, the Company filed its 2018 Annual Report as part of a Form 6-K filed with the SEC and signed by Defendant Czachor.  The Company's 2018 Annual Report included a "Message from the CEO" from Defendant Phillips which stated the following, in pertinent part, regarding the Company's government relations:

> ***The Scoping Study reinforced the fundamental advantages of our location in North Carolina, USA:…***
>
> • ***Stable and investment friendly jurisdiction – stable legal regime, established permitting process for mining operations,*** with low corporate taxes and no state mining royalties.

While our results to date have laid a solid foundation for our success, it is Piedmont's future which I find most exciting. We have several important activities already underway or pending over the coming months, including: . .

- **Permitting** – *we are actively engaged with local, state and federal regulators* in advance of a comprehensive permitting submission targeted for late-2018;

(Emphasis added.)

72.     The statements referenced in ¶71 above were materially false and misleading because Defendants knew, or recklessly disregarded but failed to disclose that Defendants were not, and had not, actively engaged with the Commissioners. The Commissioners, who control zoning changes necessary for the Project to proceed, had been "***completely left in the dark***" regarding the Project. Indeed, as Defendant Phillips later conceded: "Maybe it would have been better had (commissioners) been in the loop constantly. We didn't really have the time or resources to do it and we didn't even know what to tell them[.]" Additionally, the statement regarding the "established permitting process for mining operations" was materially false and misleading when made because Defendants did not consult the Commissioners before making this statement. Thus, Defendants had no basis to make this claim. In fact, as further explained below, subsequent to the Company's meeting with the Commissioners, the Commissioners imposed additional mining restrictions, including a special use permit, since a mine of Piedmont's anticipated size, magnitude, and depth was not previously anticipated in the existing regulations.

73.     On October 31, 2018, Piedmont filed with the SEC its annual report for the year ended June 30, 2018 on Form 20-F (the "2018 20-F"). The statements below were repeated in the October 30, 2019 annual report for the year ended June 30, 2019 filed with the SEC on Form 20-F (the "2019 20-F") and incorporated by reference in the June 2020 Registration Statement; the October 13, 2020 annual report for the year ended June 30, 2020 filed with the SEC on Form 20-F (the "2020 20-F") and incorporated by reference in the October 2020 Registration Statement and

March 2021 Registration Statement; and the June 9, 2020 prospectus filed with the SEC on Form 424B5 in connection with the June 2020 Offering:

> Private parties, such as environmental activists, frequently attempt to intervene in the permitting process and to persuade regulators to deny necessary permits or seek to overturn permits that have been issued. Obtaining the necessary governmental permits involves numerous jurisdictions, public hearings and possibly costly undertakings. These third-party actions can materially increase the costs and cause delays in the permitting process and could cause us to not proceed with the development or operation of a property. ***In addition, our ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on our ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law.*** Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

(Emphasis added.)

74.     The statements referenced in ¶73 above were materially false and misleading because Defendants knew, or recklessly disregarded but failed to disclose that the Company had not taken adequate steps to ensure that its agents would conduct "activities in a manner consistent with the creation of social and economic benefits in the surrounding communities[.]" As investors learned, the Company and/or its agents "bullied" local landowners and employed a strategy of strong-arm tactics to induce landowners to sell their property, thereby angering the local population, as well as elected and appointed officials. Indeed, Defendant Phillips conceded: "we haven't done as good a job – and I blame myself – ***with the community***[.]" The Company's failure to create social and economic benefits in the local community resulted in a petition signed by more than 1,500 individuals asking officials to block the mine. Additionally, the Company's tactics resulted in a finding by the Commissioners, described more fully below, that the Company was placing its interests over the interests of the citizens of Gaston County and could not be trusted, without

adequate local controls, to protect the health, safety, and general welfare of the Gaston County citizens.

75.     On January 10, 2019, Piedmont issued a press release entitled "Piedmont Lithium Submits Permit Applications" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits as well as quoting Defendant Phillips with regards to government relations:

> Piedmont expects to submit the balance of permit applications required to commence mining operations to various state and local agencies within the first half of 2019.
>
> Keith D. Phillips, President and Chief Executive Officer, commented: "This application is one more step towards the realization of our goal of producing battery-grade lithium hydroxide in North Carolina. An immense amount of preparatory work was completed by our team and our consulting advisors, and *we look forward to a continued constructive engagement with the appropriate regulatory bodies*."

(Emphasis added.)

76.     The statement "we look forward to a continued constructive engagement with the appropriate regulatory bodies" referenced in ¶75 above was materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose that Piedmont had not engaged with the Commissioners at the time this statement was made, had no immediate plans to do so, and, ultimately, would not do so for over two years after this statement was made.

77.     On August 7, 2019, Piedmont issued a press release entitled "Updated Scoping Study Extends Project Life and Enhances Exceptional Economics" which stated the following, in pertinent part, regarding the Company's relationships:

> Piedmont maintains an *active community engagement program* including local, state, and federal elected officials, community groups, private individuals, and local media. *Community engagement will continue through the permitting, development, and operations phases of the Project*.

<p style="text-align:center">*     *     *</p>

*A Conditional District (CD) for the Project's Mine/Concentrator approved by Gaston County will be required. The Company has held initial meetings with the Gaston County planning office and the Economic Development Commission of Gaston County. The Company is not aware of any reason why rezoning and a CD would not be granted.*

(Emphasis added.)

78.     The statements referenced in ¶77 above regarding the Company's active community engagement program were materially false and misleading for the reasons stated above in ¶¶72 and 74. Additionally, the statement that the Company is "not aware of any reason why rezoning and a CD would not be granted" is materially false and misleading for the reasons stated above in ¶70.

**Statements Regarding the Company's State Mining Permit Application and Rezoning Application Timelines Were Materially False and Misleading**

79.     On July 19, 2018, the Company issued a press release entitled "Scoping Study Delivers Outstanding Results" which stated the following, in pertinent part, regarding the Company's need, and plan, for proper permits:

**Environmental and Social Impact Assessment**

*HDR Engineering has been retained by Piedmont to support permitting activities on the project. HDR completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities….*

\*      \*      \*

*Piedmont's overall permitting timeline for the mine and concentrator is shown in Table 8.*

| Table 8: Estimated Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | | | | | | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | | | | | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | | | | | | | | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| 404 Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| 404 Permit Review and Approval Process | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | | | | | | | | |

(Emphasis added.)

80.     The statements referenced above in ¶79 and below in ¶¶81-104 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose that Piedmont had not taken the necessary steps to timely obtain or file the applications for the North Carolina state mining permit and Gaston County rezoning activities and that Piedmont repeatedly failed to inform or consult relevant authorities regarding its specific plans.  As investors later learned, Defendants cancelled their meeting with the Commissioners in March 2021 because Defendants "*weren't ready to present in March.*"  Defendants "*didn't know*" their plans in March 2021 and "*very important components that are now part of [the] plan weren't finalized then*[.]" And Defendants, admittedly, "*didn't even know what to tell*" the Commissioners until their presentation in July 2021, meaning that the stated timelines above in ¶79 and below in ¶¶81-104 regarding the state mining permit and rezoning activities were lacking in a reasonable basis at all relevant times.  Further, without meeting with the Commissioners, Defendants had no good faith basis or reasonable belief to claim that the Company would apply for or complete rezoning activities in the stated timelines, especially since Defendants conceded they knew "*from day one,*" that they "can't do anything without [the Commissioners] rezoning this property."  As stated above in ¶¶67-78, Defendants misled investors as to the level and nature of their relationship with the

Commissioners. However, as investors learned on July 20, 2021, the Company could not submit it rezoning application until it first had its state mining permit "*in hand*." The state mining permit review process "could stretch for more than a year" and the Company had yet to submit the application.

81. On July 23, 2018, the Company filed an investor presentation as part of a Form 6-K filed with the SEC signed by Defendant Czachor which provided the following slide showing the Company's purported "Rapid Development Timeline":



82. On September 13, 2018, the Company issued a press release entitled "Updated Scoping Study Improves Project Economics" which stated the following, in pertinent part, regarding the Company's need for and plan for proper permits:

**Environmental and Social Impact Assessment**

*HDR Engineering has been retained by Piedmont to support permitting activities on the project. HDR completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities….*

*    *    *

***HDR started preparation of a* 404 permit application and *mining permit application in September 2018*.**

**Piedmont's overall permitting timeline for the mine and concentrator is shown in Table 19.**

| Table 19: Estimated Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| **Task** | **J** | **F** | **M** | **A** | **M** | **J** | **J** | **A** | **S** | **O** | **N** | **D** | **J** | **F** | **M** | **A** | **M** | **J** | **J** | **A** | **S** | **O** | **N** | **D** |
| Critical Issues Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | | | | | | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | | | | | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | | | | | | | | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| 404 Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| 404 Permit Review and Approval Process | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | | | | | | | | |

(Emphasis added.)

83. On September 18, 2018, the Company filed an investor presentation as part of a Form 6-K filed with the SEC signed by Defendant Czachor which provided the following slide showing the Company's purported "Rapid Development Timeline":

84.     On September 26, 2018, the Company filed its 2018 Annual Report as part of a Form 6-K filed with the SEC and signed by Defendant Czachor.  The Company's 2018 Annual Report stated the following, in pertinent part, regarding the Company's need, and plan, for proper permits.  These statements were repeated in the October 31, 2018 press release issued by Piedmont entitled "September 2018 Quarterly Report":

> ***Commenced permitting on the Project for all federal, state and local permits, which is targeted for completion in 2019[.]***
>
> <p style="text-align:center">*       *       *</p>
>
> Complete permit applications and secure the necessary permits to commence mining and processing operations at the Project[.]

(Emphasis added.)

85.     On October 31, 2018, Piedmont filed the 2018 20-F with the SEC.  The statements below were repeated in the 2019 20-F and incorporated by reference in the June 2020 Registration Statement; and the 2020 20-F and incorporated by reference in the October 2020 Registration Statement and March 2021 Registration Statement.

**Permitting**

<p style="text-align:center">*       *       *</p>

> Prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits authorizing, among other things, any mine development activities and mine operating activities.  Obtaining and renewing governmental permits is a complex and time-consuming process and involves numerous jurisdictions, public hearings and possibly costly undertakings.  ***The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority***.  ***We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations***.  Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties.  See "Risk Factors—We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming."

**Specialized Skill and Knowledge**

*We rely on specialized skills and knowledge to* gather, interpret and process geological and geophysical data, ***successfully permit*** and then design, build and operate extraction facilities and ***numerous additional activities*** required to extract lithium. We expect to employ a strategy of contracting consultants and other service providers to supplement the skills and knowledge of our permanent staff in order to provide the specialized skills and knowledge to undertake our lithium operations effectively.

(Emphasis added.)

86.     These documents stated the following regarding "risks." The statements were also repeated in the June 9, 2020 prospectus filed with the SEC on Form 424B5 in connection with the June 2020 Offering:

*We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.*

We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. *The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority. We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations.* Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities.

(Emphasis added.)

87.     On December 3, 2018, Piedmont issued a press release entitled "Placement to Raise A$12 million" in which Defendant Phillips stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits. This statement was repeated in the July 3, 2019 press release entitled "Institutional Placement to Raise A$21 million":

Mr. Keith Phillips, President and CEO, said: . . . ***"We have an exciting year ahead and securing these funds will allow us to maintain our ambitious development timetable for what we believe to be the world's most strategically located lithium project."***

(Emphasis added.)

88.     On December 6, 2018, the Company filed an investor presentation as part of a Form 6-K filed with the SEC signed by Defendant Czachor which provided the following slide showing the Company's purported "Indicative Development Timeline":



89.     On January 10, 2019, Piedmont issued a press release entitled "Piedmont Lithium Submits Permit Applications" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

Piedmont Lithium Limited ("Piedmont" or "Company") is pleased to announce that it has submitted a Section 404 Standard Individual Permit application to the US

Army Corps of Engineers (USACE) for the Company's Piedmont Lithium Project located in the historic Carolina Tin-Spodumene Belt in North Carolina, USA…

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources (NCDWR)…

***These important applications were completed and submitted in accordance with the Company's previously announced estimated permitting timeline (refer to updated Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule.***

| Previously Announced Permitting Timeline for Piedmont Lithium's Mine / Concentrator | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | ░ | ░ | ░ | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | █ | █ | █ | █ | █ | █ | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | █ | █ | █ | █ | █ | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | █ | █ | █ | █ | █ | █ | | | | | | | | | | | | | |
| 404/401 Permit Application Preparation | | | | | | | | █ | █ | █ | █ | █ | | | | | | | | | | | | |
| 404/401 Permit Review and Approval Process | | | | | | | | | | | | | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| Mining Permit Application Preparation | | | | | | | | | █ | █ | █ | █ | █ | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | █ | █ | █ | █ | █ | █ | █ | █ |

***Piedmont expects to submit the balance of permit applications required to commence mining operations to various state and local agencies within the first half of 2019.***

(Emphasis added.)

90.     On January 30, 2019, Piedmont issued a press release entitled "December 2018 Quarterly Report" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

**Submission of Permit Applications**

During the quarter, the Company submitted a Section 404 Standard Individual Permit application to the US Army Corps of Engineers ("USACE") for the Project…

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources ("NCDWR")…

***These important applications were completed and submitted in accordance with the Company's previously announced estimated permitting timeline (refer to updated***

*Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule.*

| Previously Announced Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2018** | | | | | | | | | | | | **2019** | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | | | | | | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | | | | | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | | | | | | | | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| 404/401 Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| 404/401 Permit Review and Approval Process | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | | | | | | | | |

91.     On April 9, 2019, Piedmont issued a press release entitled "Piedmont Lithium Project Development Update" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

| Mine Concentrator Development | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Task | J | F | M | A | M | J | J | A | S | O | N | D |
| Land Acquisition | | | | | | | | | | | | |
| Geology - Exploration Drilling | | | | | | | | | | | | |
| Geology - Resource Update | | | | | | | | | | | | |
| Geology - Infill Drilling | | | | | | | | | | | | |
| Geology - Reserve Statement | | | | | | | | | | | | |
| Metallurgy - Concentrator PFS Testwork | | | | | | | | | | | | |
| Metallurgy - Concentrator DFS/Pilot Testwork | | | | | | | | | | | | |
| Engineering - Updated Scoping Study | | | | | | | | | | | | |
| Engineering - DFS Engineering | | | | | | | | | | | | |
| Permitting - Rule 404 Permitting | | | | | | | | | | | | |
| Permitting - NC State Mining Permit | | | | | | | | | | | | |
| Permitting - Community Engagement | | | | | | | | | | | | |
| Offtake, Financing and Strategic Discussions | | | | | | | | | | | | |

Keith D. Phillips, President and Chief Executive Officer, said[:] *"We continue to make good progress in several areas critical to our strategy, and remain on-track to begin construction in early-2020, consistent with the schedule we established in late-2017."*

*         *         *

**Permitting Activities Proceeding as Anticipated**

The public comment period for the Company's Section 404 Standard Individual Permit application to the US Army Corps of Engineers (USACE) concluded in

February 2019. Piedmont has received the comments from USACE and other regulatory agencies and will provide responses by May 31, 2019. **_Piedmont is also proceeding with state and local permit applications._** The Company will undertake a series of community engagement meetings in the coming months and **_anticipates applying for a North Carolina state mining permit and Gaston County conditional zoning in Q3 2019._**

The federal and state reviews are both proceeding as expected and the Company remains confident that the permitting processes will be successfully concluded by year-end 2019.

(Emphasis added.)

92.     On April 30, 2019, Piedmont issued a press release entitled "March 2019 Quarterly Report" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

### Submission of Permit Applications

During the quarter, the Company submitted a Section 404 Standard Individual Permit application to the US Army Corps of Engineers for the Project…

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources...

**_These important applications were completed and submitted in accordance with the Company's previously announced estimated permitting timeline (refer to updated Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule._**

(Emphasis added.)

93.     On May 28, 2019, the Company filed a corporate presentation as part of a Form 6-K filed with the SEC signed by Defendant Czachor which provided the following slide showing the Company's purported "Near-Term Catalysts":

## USA's Only Conventional Lithium Project

| INTEGRATED BUSINESS | • Integrated spodumene-to-hydroxide business model<br>• One of four such large projects globally |
| IDEAL LOCATION | • Abundant infrastructure and lithium talent pool<br>• 50+ years of lithium processing in North Carolina |
| LOW COSTS | • 1st quartile operating costs<br>• US$888mm NPV on initial 13-year mine life |
| VAST GROWTH POTENTIAL | • Phase 4 drilling underway; resource update in June 2019<br>• Continued land consolidation will drive resource scale |
| NEAR-TERM CATALYSTS | • Next 90 days – Resource, Metallurgy and Scoping updates<br>• Next 6 months – Offtake, Permits and Feasibility Study |
| VALUATION UPSIDE | • Trading at <10% of Project NPV<br>• Kidman & Wodgina deals imply huge upside for PLL shares |

PIEDMONT                    ASX:PLL; NASDAQ:PLL     2

2

94.     A similar slide making similar representations was filed on June 26, 2019, as part of a Form 6-K filed with the SEC signed by Defendant Czachor.

95.     On August 7, 2019, Piedmont issued a press release entitled "Updated Scoping Study Extends Project Life and Enhances Exceptional Economics" which stated the following, in pertinent part, regarding the Company's progress with, and plan for, proper permits:

**Conclusions and Next Steps**

The Scoping Study demonstrates the integrated Project's strong commercial potential, and now puts Piedmont in a strong position to engage in discussions around future financing of the Project, including with prospective strategic and off-take partners. ***The Company will now concentrate on the following initiatives to create additional value in the Project:…***

•     Secure the necessary permits and approvals for the Mine/Concentrator[.]

<center>*    *    *</center>

***Waste disposal areas on the Project have been designed to a detail sufficient for permit approvals.…***

<center>*    *    *</center>



*Figure 5 – Waste rock disposal areas have been designed to sufficient detail for permit applications and approval.*

## Site Plans

## Mining Operations

A preliminary integrated site plan including mining operations, waste disposal, and concentrator was developed by Marshall Miller and Primero Group during the course of this Scoping Study. ***The site plan has been developed to a pre-feasibility level of detail and with sufficient definition to acquire permits*** (Figure 11).…



*Figure 11 – Overall Mine/Concentrator Site Plan*

\*  \*  \*

*A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months.*

*Background studies undertaken in support of permit applications have been constructive, and the conclusions reached in each individual study to date have met the requirements which would normally support permit approval.*

\*  \*  \*

*Piedmont has completed all necessary background studies required for the submission of all permit applications for the project as of July 2019.*

(Emphasis added.)

96. On August 14, 2019, Piedmont issued a press release, attached to the Form 6-K, entitled "Scoping Study Update – August 2019" which included the following slide, in pertinent part, regarding the Company's "Near-Term Catalysts" and stating that "Permitting is well-advanced":

## USA's Only Conventional Lithium Project

| IDEAL LOCATION | • >50 years of lithium processing in North Carolina<br>• Abundant infrastructure and lithium talent pool<br>• Pure spodumene mineralogy on TSB |
| --- | --- |
| EXCEPTIONAL ECONOMICS | • 25-year project life<br>• NPV of US$1.45B and IRR of 34%<br>• Steady-state EBITDA of US$298M |
| NEAR-TERM CATALYSTS | • Permitting is well-advanced<br>• Exploration drilling and LiOH testwork in H2 2019<br>• Strategic and offtake discussions underway |
| VALUATION UPSIDE | • Sector at 2-year lows despite strong demand outlook<br>• PLL trading at ~5% of NPV<br>• Recent M&A deals imply huge upside |

PIEDMONT                                    ASX:PLL; NASDAQ:PLL        2

2

97.     A similar slide making similar representations was filed on September 17, 2019, as part of a Form 6-K filed with the SEC signed by Defendant Czachor.

98.     On November 26, 2019, Piedmont issued a press release entitled "Piedmont Lithium Receives Federal Permit to Develop Mine" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: "Securing a Section 404 Individual Permit is a major milestone for any natural resource project in the United States, and we are very pleased to have received this authorization. I want to thank our team members and advisors who have worked so diligently and cooperatively throughout this rigorous process, and also express our thanks to the Army Corps of Engineers for the highly professional manner in which they have approached this Project from day one. We will now move forward with the permitting of our chemical plant operations during 2020. Our project is unique in being the only spodumene-to-hydroxide project in the United States, and now also

stands out as the most advanced American lithium project from a permitting perspective. ***We are very excited about the important milestones ahead of us as we look to deliver a DFS for a fully permitted integrated project by the end of 2020***."

(Emphasis added.)

99.      On December 4, 2019, Piedmont issued a press release entitled "Hatch Appointed to Deliver PFS for Piedmont's Lithium Hydroxide Project in North Carolina" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: "We are very pleased to be working with Hatch on the PFS for our lithium hydroxide project. Hatch has unsurpassed lithium processing experience, having studied directly comparable projects for several clients. ***Having recently received a landmark permit for our mine/concentrator we are moving full-speed ahead to having a shovel-ready project by the end of 2020.***"

(Emphasis added.)

100.      On February 26, 2020, Piedmont issued a press release entitled "Hydroxide Testwork Program Proceeding Favorably" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: "We are very encouraged by the positive results generated thus far in the lithium hydroxide testwork program, and expect the final results to be announced in the near future. The optimization tests performed by SGS will allow us to refine the proposed Chemical Plant flowsheet and will underpin the prefeasibility study targeted for completion in Q2 2020. Completion of the PFS, ***along with continued advances on the permitting and offtake fronts, position us to advance our Project to shovel-ready status by the end of the year***, well-timed for the recovery in lithium prices and market sentiment that many observers are forecasting for the remainder of this year."

(Emphasis added.)

101.      On May 26, 2020, Piedmont issued a press release entitled "Chemical Plant PFS Demonstrates Exceptional Economics and Optionality of USA Location" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

**2.10 Mine / Concentrator Site Plan**

A preliminary integrated site plan including mining operations, waste disposal, and concentrator was developed by Marshall Miller and Primero Group during the course of Mine/Concentrator design and Integrated Project Scoping Study. ***The site plan has been developed to a pre-feasibility level of detail and with sufficient definition to acquire permits (Figure 22).***



Figure 22 - Overall Mine/Concentrator Site Plan

\*     \*     \*

## 2.14 Permitting

HDR Engineering has been retained by Piedmont to support permitting activities on the Integrated Project. ***Permitting activities for the Mine/Concentrator are well advanced…***

> ***A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months.***

(Emphasis added.)

102.    On December 3, 2020, Piedmont issued a press release entitled "Piedmont Receives Key Permit for Chemical Operations" which stated the following, in pertinent part, regarding the Company's progress with and plan for proper permits:

> Combined with the Section 404 Standard Individual Permit received in November 2019 from the US Army Corps of Engineers for the Company's planned concentrate operations, Piedmont now holds all of the federally-regulated permits required for the construction of the integrated project. ***The Company expects to apply for a North Carolina State Mining Permit and to complete local rezoning processes for the integrated project in the first half of 2021.***

> Keith D. Phillips, President and Chief Executive Officer, commented: "Securing our Title V Air Permit represents a major milestone for our integrated lithium hydroxide business, and we are very pleased to have received this authorization. Our project is unique in being the only spodumene-to-hydroxide project in the United States, and together with our previously received federal permit for our concentrate operations now also stands out as the most advanced American lithium project. ***We are very excited about the important milestones ahead of us as we look to deliver a DFS for a fully permitted integrated project next year.***"

(Emphasis added.)

103.    On January 11, 2021, Piedmont issued a press release entitled "Piedmont Lithium Announces Strategic Investment in Quebec Hard-Rock Lithium Developer Sayona Mining" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> "This is a very exciting step for Piedmont…. ***2021 will be an important year for our Piedmont Lithium Project, as we plan to*** expand our mineral resources, ***finalize permitting***, execute additional lithium offtake agreements, complete an integrated definitive feasibility study, and secure strategic project financing. ***We are fortunate to have a strong balance sheet to comfortably fund the Sayona investments without compromising our aggressive plans in North Carolina***."

(Emphasis added.)

104.     On January 29, 2021, Piedmont issued a press release entitled "December 2020 Quarterly Report" which quoted Defendant Phillips stating the following regarding the Company's progress with and plan for proper permits:

> Following our highly successful equity offering in October, ***Piedmont enters 2021 with a strong balance sheet that will enable the Company to meet its development objectives for the coming year. Our expanded team continues to do a great job on the ground in North Carolina*** in mineral exploration, metallurgical testwork, technical studies, ***and permitting that may make it possible for Piedmont to begin construction of our project by the end of this year.*** We expect 2021 will be a pivotal year for Piedmont Lithium, and we are excited about the months ahead.
>
> *             *             *
>
> Combined with the Section 404 Standard Individual Permit received in November 2019 from the US Army Corps of Engineers for the Company's planned concentrate operations, Piedmont now holds all of the federally-regulated permits required for the construction of the integrated project. ***The Company expects to apply for a North Carolina State Mining Permit and to complete local rezoning processes for the integrated project in the first half of 2021.***

(Emphasis added.)

105.     The statements referenced above in ¶¶81-104 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose that Piedmont had not taken the necessary steps to timely obtain or file the applications for the North Carolina state mining permit and Gaston County rezoning activities and that Piedmont repeatedly failed to inform or consult relevant authorities regarding its specific plans. As investors later learned, Defendants cancelled their meeting with the Commissioners in March 2021 because Defendants "weren't ready to present in March." Defendants "didn't know" their plans in March 2021 and "very important components that are now part of [the] plan weren't finalized then[.]" And Defendants, admittedly, "didn't even know what to tell" the Commissioners until their presentation in July 2021, meaning that the stated timelines above in ¶¶81-104 regarding the state mining permit and rezoning activities were lacking a reasonable basis at all relevant times. Further, without meeting with the

Commissioners, Defendants had no good faith basis or reasonable belief to claim that the Company would apply for or complete rezoning activities in the stated timelines, especially since Defendants conceded they knew "from day one," that they "can't do anything without [the Commissioners] rezoning this property." As stated in ¶¶67-78, Defendants misled investors as to the level and nature of their relationship with the Commissioners. However, as investors learned on July 20, 2021, the Company could not submit it rezoning application until it first had its state mining permit "in hand." The state mining permit review process "could stretch for more than a year" and the Company had yet to submit the application.

### Violations of Items 303 and 105 of Regulation S-K

106. In addition to the materially false and misleading statements identified above, Defendants also violated their affirmative obligations to provide certain material information as required by applicable SEC rules and regulations.

107. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), requires issuers to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

108. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

> \*     \*     \*

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

109.     Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)      Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)      If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

110.     The failure of Defendants to disclose that the timelines and completion of the Project remained uncertain due to the fact that Defendants had not taken the necessary steps to timely obtain or file the applications for the North Carolina state mining permit or discuss or present the Project's plans with the Commissioners violated Item 303 because these undisclosed adverse events and/or uncertainties were known to management and would and did have a material impact on the Company's financial condition, results and net income from continuing operations.

111.     In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the Company's "Risk Factors," a "discussion of the material factors that make an investment in the registrant or offering speculative or risky" and that each risk factor "adequately describe[] the risk," including by concisely explaining "how each risk affects the registrant or the securities being offered."  Defendants failed to adequately describe the risks of Project delays or completion arising from their failure to take the necessary steps to timely obtain or file the applications for the North Carolina state mining permit and Gaston County rezoning activities and failure to inform or consult relevant authorities regarding the Company's specific plans, despite the fact that these risks were admittedly known and already affecting the Company.

112. In fact, the purported risk factors that the Company provided, identified in ¶¶73 and 86, were themselves materially misleading. While Defendants acknowledged the materiality to the Company of certain categories of potentially adverse events, they failed to disclose certain significant adverse events that were then already occurring. Instead, they offered only generic, boilerplate discussions of future potential adverse impacts to the Company that "***may***" occur, while failing to disclose that examples of these adverse events had ***already*** occurred. For example, Defendants stated that "the cost and time required to obtain or renew such permits ***may*** exceed our expectations," without disclosing that the Company had repeatedly failed to file the relevant applications in their stated timelines. Additionally, Defendants stated that "our ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on our ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities," without disclosing that, at the time this statement was made (or referred back to), the Company had already failed to inform relevant authorities of its specific plans and, in doing so, angered the local population and elected officials.

113. As such, the discussion of potential events that *may* occur while failing to disclose related events that ***had already occurred*** and were then impacting Piedmont rendered these statements of future, contingent so-called "risks" themselves materially misleading.

### Post-Class Period Events

114. The fallout from the aforementioned revelations of the truth continued to reverberate after the end of the Class Period. On August 2, 2021, *Reuters* reported that Piedmont would be

delaying the first shipments of lithium chemicals to Tesla and there was no definitive date for when deliveries could begin.[4]

115.    On August 6, 2021, the Commissioners held a special meeting and unanimously voted to approve a 60-day development moratorium on mining activities to rework regulations in the UDO. The Commissioners concluded that a mine of Piedmont's anticipated size, magnitude, and depth was not anticipated in existing regulations; the process of lithium mining poses an imminent and substantial threat to public health and safety; and that, based on reliable complaints from neighboring citizens that the Company and its agents had used abusive and threatening communications to strong-arm residents into selling their land, the Company had placed its own interests over the interests of the citizens of Gaston County and could not be trusted, without adequate local controls, to protect the health, safety, and general welfare of Gaston County's citizens.

116.    On August 30, 2021, the Company announced that it filed an application for a North Carolina state mining permit with the North Carolina DEQ Division of Energy, Mineral and Land Resources.

117.    On September 28, 2021, the Commissioners unanimously approved new mining restrictions in the UDO, requiring new mines and quarries to operate on industrially-zoned (I-3) property and a special use permit considered and issued by the Commissioners, which first must be recommended by the county planning board. At least two public information meetings must be held before a special use permit is granted. Additionally, if rezoning is required to establish an

---

[4] Ernest Scheyder, *Piedmont Lithium delays timeline to supply Tesla*, REUTERS (Aug. 2, 2021), https://www.reuters.com/business/energy/piedmont-says-has-delayed-timeline-supply-lithium-tesla-2021-08-02/.

industrially-zoned (I-3) district, then the application for a special use permit shall only be filed and accepted after approval of the rezoning of the property.

118.     Further, pursuant to Section 8.3.21 of the UDO, the owner of the mine must provide Gaston County a copy of their state mining permit within thirty days of issuance; no blasting shall be conducted until one hour after sunrise or within one hour of sunset, Sundays, and specified holidays; the perimeter of any mine or quarry pits must be at least 500 feet from any occupied structure; deliveries of specified materials including minerals, metals, and ores shall not occur between the hours of 10:00 PM and 6:00 AM; mining and quarrying facilities shall have a security fence surrounding the area of operations; and the owner of the mine must submit a noise mitigation plan for approval by the Commissioners.

119.     On November 15 and 18, 2021, due to significant public interest, the North Carolina DEQ Division of Energy, Mineral, and Land Resources held public hearings in connection with the Company's North Carolina state mining permit application.   The Company has since received requests for additional information from the North Carolina DEQ Division of Energy, Minerals, and Land Resources.

120.     On February 7, 2022, *WCNC Charlotte* published an article entitled "'Sorry for my frankness, but let's get to it' | Emails detail growing frustration between Gaston County commissioners, Piedmont Lithium" which reported the following, in pertinent part, regarding the Company's regulatory issues in North Carolina:

> As Piedmont Lithium was touting progress toward eventually mining lithium near Cherryville, Gaston County commissioners were privately criticizing the company and voicing alarm about the mine's impacts, according to a WCNC Charlotte Defenders investigation.
>
> Piedmont Lithium has claimed their mine, which would sell lithium it extracted to electric car companies like Tesla, would result in hundreds of millions of dollars of economic investment.

*However, county commissioners were airing concerns about the mine's impacts on traffic, pollution, and surrounding property values in January 2021, months earlier than previously reported.*

\*  \*  \*

WCNC Charlotte's Defenders team reviewed more than a thousand pages of internal county emails detailing months of conversations between county commissioners, county employees, residents, and Piedmont Lithium's senior leadership.

In January 2021, Commissioner Allen Fraley, whose township would include Piedmont Lithium's mine, if approved, asked the board not to vote on a critical rezoning permit the mine needed until commissioners got all the information they requested from county staff.

"It certainly appears to me that PL [Piedmont Lithium] is acting in a manner this is a done deal and will get a 'rubber stamp' approval," Commissioner Fraley wrote. "***I don't think that will be the case.***"

Commissioner Tracy Philbeck responded, "***As of now, Gaston County gets the hole, the mess, the traffic, the environmental consequences and that is about it.***"

Commissioner Tom Keigher, who was the board's chairman last year, followed up by saying he ran into former county attorney Chuck Moore who, "***agrees with us about concerns. [The] company is acting flippant.***"

\*  \*  \*

On April 19, 2021, Malissa Gordon, who worked for Gaston County's Economic Development Commission before becoming Piedmont Lithium's community and government relations manager, emailed an update on the company's progress toward building the mine.

Commissioner Chad Brown replied, "***Why are we the last to know the plans of this organization?  We yet have heard anything of substance but everyone else has.  I have been asked more from people for or against this site but nothing from Piedmont.  It's hard to say or tell anyone other than no one has presented ANYTHING to us.***"

Gordon wrote back, "***We know we haven't taken the right steps or direction as far as informing you all about the project.***  It truly hasn't been to hide anything or to make you think we can do this project without the support of Gaston County."

She continued, "***Again, we know this hasn't been the best start with you all as far as communication*** and we apologize for that."

Brian Risinger, Piedmont Lithium's vice president of corporate communications and investor relations, sent similar update emails in May and June.

In response to one of the emails, Commissioner Brown wrote, "***Frankly, I'm tired of seeing this continue through email...we should have been the first stop, not the last.***"

Commissioner Keigher also responded to one of Risinger's emails by writing, "***Sorry for my frankness, but let's get to it. I see no more need [for] messages that have no real info.***"

Following the July 20 meeting, Gaston County commissioners voted on Aug. 6 to place a 60-day moratorium on all mining activities in the county.

Commissioners had previously hired Tom Terrell, who has expertise in the mining industry, to represent them in communications with the company.

Following the moratorium vote, Piedmont Lithium responded with a press release on Aug. 9, saying, "The Company looks forward to constructive engagement with the county commissioners and staff on the many important matters subject to their review."

The next day, Terrell, emailed Piedmont Lithium's attorneys, "***Not to be testy, but Piedmont Lithium has shared an abundance of information with an abundance of people, and I've received nothing. I don't even know what I don't know. If your client wants a seat at the table, it needs to be pro-active and creative in figuring out what I need from you.***"[5]

(Emphasis added.)

121.    Indeed, uncovered emails reviewed by WCNC Charlotte's Defenders included an April 20, 2021 email from Malissa Gordon to Commissioner Chad Brown stating: "One thing I am learning since starting here in August is this project certainly isn't like most we have worked on together while at the [Economic Development Commission]. This is a different type of project, with many moving pieces as far as land and components of the operation that were constantly changing up to this point." *Id*.

122.    The Company remains in pre-application consultation with the Commissioners.

---

[5] *'Sorry for my frankness, but let's get to it' | Emails detail growing frustration between Gaston County commissioners, Piedmont Lithium*, WCNC (Feb. 7, 2022) https://www.wcnc.com/article/news/investigations/investigators-emails-gaston-county-commissioners-piedmont-lithium/275-e8f3b65f-13a2-4990-976e-6594ca3f365d.

## Additional Scienter Allegations

123.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Piedmont, their control over, and/or receipt and/or modification of Piedmont's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Piedmont, were active and culpable participants in the fraudulent scheme alleged herein.

124.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

125.    The Individual Defendants, because of their positions with Piedmont, controlled the content of the Company's public statements during the Class Period. The Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the

positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Piedmont's corporate statements and is therefore responsible and liable for the misrepresentations contained therein. At the very least, when making their public statements, the Individual Defendants were required to have a legitimate and valid basis for their representations. To the extent they were lacking such a basis, they are likewise responsible and liable for the misrepresentations contained therein

126.  Upon information and belief, at all relevant times, Piedmont was a small company with approximately 30 employees. Its core asset is its wholly-owned interest in the Project and developing the Project was the Company's exclusive focus at the start of the Class Period. As a result, the Individual Defendants knew of, or had access to information regarding, the status of the required permits and rezoning activities, including the critical issues analysis completed by HDR Engineering before the start of the Class Period, which identified the various permits the Company would need to commence mining and concentrator activities. Additionally, by Defendant Phillips' own admission, the Company was aware "from day one" that rezoning activities would need to be approved by the Commissioners, and that a North Carolina state mining permit was also required. The Individual Defendants, because of their positions with Piedmont, were thus aware of the true state of affairs and the steps and activities the Company had or had not completed as alleged herein.

127.  Defendants knowingly or recklessly misled investors that the state mining permit and rezoning applications were going to be submitted in the stated timelines. As Defendant Phillips later admitted, the Company "didn't know [their] plans" when they cancelled their meeting with the Commissioners in March 2021 and "didn't even know what to tell [the Commissioners]" until their presentation in July 2021. Investors, on the other hand, were told:

- on January 10, 2019: "Piedmont expects to submit the balance of permit applications required to commence mining operations to various state and local agencies within the first half of 2019";

- on April 9, 2019: "Piedmont is also proceeding with state and local permit applications. The Company . . . anticipates applying for a North Carolina state mining permit and Gaston County conditional zoning in Q3 2019";

- on August 7, 2019: "A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months";

- on December 4, 2019: "we are moving full-speed ahead to having a shovel-ready project by the end of 2020";

- on February 26, 2020: "Completion of the [prefeasibility study], along with continued advances on the permitting and offtake fronts, position us to advance our Project to shovel-ready status by the end of the year";

- on May 26, 2020: "Permitting activities for the Mine/Concentrator are well advanced";

- on May 26, 2020: "A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months"; and

- on December 3, 2020 and January 29, 2021: "The Company expects to apply for a North Carolina State Mining Permit and to complete local rezoning processes for the integrated project in the first half of 2021."

128. Defendants also knowingly or recklessly misled investors about their relationship with the relevant authorities – *i.e.*, the Commissioners, who controlled the crucial zoning changes. As Defendant Phillips confirmed: the Company knew "from day one" that they "can't do anything without [the Commissioners] rezoning this property – full stop." However, despite not formally approaching the Commissioners until July 2021 and leaving them "completely . . . in the dark" regarding the Project, the Company proceeded to tell investors in June 2018 that they benefit from "Strong local government support"; in September 2018 that "we are actively engaged with local, state and federal regulators"; in January 2019 that "we look forward to a continued constructive engagement with the appropriate regulatory bodies"; in August 2019 that "Piedmont maintains an

active community engagement program including local . . . elected officials"; and, twice, that that they were "not aware" of any reason why rezoning processes would not be approved.

129.     In truth, these statements caused the value of the Company's securities to be artificially inflated and enabled the Company to complete multiple successful public equity offerings that generated approximately $193 million in proceeds.

130.     In fact, emails uncovered by WCNC Charlotte *confirm* that the Company intentionally avoided presenting any substantive information about the Project to the Commissioners during the Class Period.  An email from Commissioner Brown to Malissa Gordon of Piedmont during the Class Period stated, in pertinent part: "We yet have heard anything of substance but everyone else has.  I have been asked more from people for or against this site but nothing from Piedmont.  It's hard to say or tell anyone other than no one has presented ANYTHING to us."  In response, Malissa Gordon of Piedmont conceded: "We know we haven't taken the right steps or direction as far as informing you all about the project."  WCNC, *supra* n.5.

131.     Additionally, the Commissioners responded to update emails from Brian Risinger, Piedmont's vice president of corporate communications and investor relations, as follows during the Class Period: "Frankly, I'm tired of seeing this continue through email. . . we should have been the first stop, not the last" and "Sorry for my frankness, but let's get to it.  I see no more need [for] messages that have no real info."  *Id*.

132.     Defendants' positive statements about the Project also drew the attention of others, including Tesla, with whom the Company was able to enter into an agreement for supplying spodumene concentrate.  Ultimately, it was reported that Piedmont would be delaying the first shipments of lithium chemicals to Tesla as there was no definitive date for when deliveries could begin.

133.     Also, the fact that Defendant Phillips and Brindle both sold substantial portions of their personally-held shares of Piedmont stock on July 5-6, 2021 provides a further strong inference of scienter.  Defendant Phillips and Brindle sold their shares a ***mere two weeks*** before the *Reuters* article was published, which was the first time that investors learned that the Commissioners had not previously been spoken with, or provided information about, the Project.  Importantly, these sales took place two weeks before both Phillips and Brindle made the Company's first public presentation to the Commissioners, which, independent of the *Reuters* article, would have informed investors that the Project, in truth, did not benefit from strong local government support.

134.     In particular, on July 5-6, 2021, Defendant Phillips completed his first reported sales of Piedmont stock,[6] selling approximately 13.19% of his personally-held shares over the course of two days, for gross proceeds of approximately $1.97 million.  These transactions were highly unusual as they represented Defendant Phillips' first reported sales in the Company and occurred a mere two weeks before he was set to present the Project to the Commissioners.  Likewise, on July 6, 2021, Brindle, the Project Manager and co-presenter before the Commissioners, made his first sales of Piedmont stock, selling approximately 31.93% of his personally held shares on that single day for gross proceeds of approximately $1.49 million.

135.     If Phillips and Brindle had actually believed the positive statements detailed herein, it would have been economically irrational for them to sell substantial portions of their personally-held shares just two weeks before they were both set to present the Project to the Commissioners, since the value of their shares would have increased following a favorable reception from the Commissioners and affirmance to investors that the Project was proceeding at the pace Defendants

---

[6]     The allegations in this Amended Class Action Complaint for Violations of the Federal Securities Laws include only insider transaction information obtained from publicly filed documents with the SEC and do not include insider transactions in the Company's securities that may have been made on foreign stock exchanges.

represented. By selling substantial portions of their personally-held shares near Class Period highs for proceeds of approximately $1.97 million and $1.49 million, respectively, Phillips and Brindle were able to capitalize on the inflated value of their shares before investors were apprised of the true state of affairs.

136.    Accordingly, Defendants were motivated to engage in the aforementioned fraudulent course of conduct to allow Defendant Phillips and Brindle to collectively sell 46,080 shares of their personally-held Piedmont stock for proceeds of approximately $3.46 million during the Class Period as follows:

| Insider | Date | Price | Shares Sold | Proceeds |
|---------|------|-------|-------------|----------|
| Defendant | 7/5/2021 | $76.92 | 4,000 | $307,680 |
| Phillips | 7/6/2021 | $77.66 | 3,500 | $271,810 |
| (CEO, President) | 7/6/2021 | $71.95 | 4,445 | $319,818 |
| | 7/6/2021 | $74.88 | 1,622 | $121,455 |
| | 7/6/2021 | $73.75 | 2,258 | $166,528 |
| | 7/6/2021 | $78.04 | 3,158 | $246,450 |
| | 7/6/2021 | $77.22 | 3,624 | $279,845 |
| | 7/6/2021 | $72.66 | 1,620 | $117,709 |
| | 7/6/2021 | $76.20 | 1,853 | $141,199 |
| | | | **26,080** | **$1,972,494** |
| Patrick Brindle | 7/6/2021 | $71.00 | 10,000 | $710,000 |
| (Project Manager, | 7/6/2021 | $78.02 | 5,500 | $429,110 |
| Chief Development | 7/6/2021 | $77.23 | 4,500 | $347,535 |
| Officer) | | | **20,000** | **$1,486,645** |
| | **Total:** | | **46,080** | **$3,459,139** |

## Corporate Scienter

137.    The allegations above also establish a strong inference that Piedmont as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

138. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the adverse facts detailed herein from the investing public. Indeed, Defendant Phillips' own admission that the Company knew "from day one" that the property needed to be rezoned by the Commissioners, and that the Company subsequently did not meet with or consult the Commissioners regarding rezoning or the Project despite stating that it had "[s]trong local government support" establishes corporate scienter. Additionally, Defendant Phillips' statements that the Company "didn't know" their plans and "weren't ready to present" to the Commissioners until their presentation in July 2021 further establishes corporate scienter. By concealing these material facts from investors, Piedmont maintained and/or increased its artificially inflated securities prices throughout the Class Period.

139. Moreover, corporate scienter is additionally supported by the fact that Piedmont was a small company whose sole focus at the start of the Class Period was proving the Project's potential, and, by the start of the Class Period, Defendants had received a critical issues analysis from HDR Engineering that identified the necessary permits and rezoning activities that the Company needed to complete to begin mining and concentrator activities for lithium in North Carolina. Given the details of the representations made by the Individual Defendant throughout the Class Period regarding the state mining permit and rezoning application timelines, each of the Individual Defendants either made himself aware of the Company's actual (but undisclosed) plans with respect to the timing of these applications or had no factual basis to make such statements. In either event, the Individual Defendants were at least reckless with respect to the truth, and their scienter is imputable to the Company.

## LOSS CAUSATION/ECONOMIC LOSS

140. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Piedmont securities

and operated as a fraud or deceit on Class Period purchasers of Piedmont securities by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Piedmont securities fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Piedmont securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

141. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Piedmont's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused Piedmont securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $88.97 per share on March 18, 2021.

142. On July 20, 2021, before the markets opened, a *Reuters* article revealed to investors for the first time that: (i) the Commissioners had not previously been spoken with by Piedmont, or provided with information, about the Project; (ii) the Project did not benefit from strong local government support; and (iii) five out of seven Commissioners stated they may block or delay the Project. Scheyder, *supra* n.3. In response to this disclosure, the price of Piedmont stock fell $12.56 per share over the trading day, or nearly 20%, to close at $50.52 per share on July 20, 2021.

143. The precipitous decline in the price of Piedmont stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of Piedmont stock negates any inference that the losses suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of

Defendants' fraudulent scheme to artificially inflate the price of Piedmont stock and the subsequent significant decline in the value of Piedmont stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

144.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all investors who purchased or otherwise acquired the publicly traded securities of Piedmont during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, members of the immediate families of each Defendant, the Company and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

145.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

147. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

148. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants misrepresented and/or omitted material facts about Piedmont and its business;

(c) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d) whether the price of Piedmont securities was artificially inflated during the Class Period; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

149. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<div align="center">

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**
**and *Affiliated Ute* Doctrine**

</div>

150. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things, during the Class Period:

(a)     Defendants made public misrepresentations or failed to disclose material facts;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities traded in efficient markets;

(d)     the Company's securities were liquid and traded at heavy volumes;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     unexpected material news about the Company was rapidly reflected in and incorporated into the Company's security price.

151.    As a result of the foregoing, the market for Piedmont securities promptly digested current information regarding Piedmont from all publicly available sources and reflected such information in the prices of the Company's securities. Under these circumstances, all purchasers of Piedmont securities during the Class Period suffered similar injury through their purchase of Piedmont securities at artificially inflated prices and a presumption of reliance applies.

152.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Piedmont's business and prospects – information that Defendants were obligated to disclose – positive proof of reliance is not

a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

153. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**No Safe Harbor**

154. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Furthermore, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Piedmont who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

155. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

156. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

157.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158.    The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

159.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

160.    The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative,

acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

161.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

162.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

163.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

164.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

165.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

166. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

167. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

168. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

169. The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

170. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class representative, and designating Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: April 8, 2022                    ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                 SAMUEL H. RUDMAN
                                                 DAVID A. ROSENFELD
                                                 WILLIAM A. MASSA

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
wmassa@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway, 41st Floor
New York, NY  10019
Telephone:  212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on April 8, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

<div style="text-align: right;">

_/s/ David A. Rosenfeld_
DAVID A. ROSENFELD

</div>