UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PIEDMONT LITHIUM INC. SECURITIES LITIGATION | **MEMORANDUM AND ORDER** <br> 21-CV-4161 (OEM) (PK) |

**ORELIA E. MERCHANT, United States District Judge:**

Lead Plaintiff Ace Association LLC ("Plaintiff"), individually and on behalf of all other similarly situated individuals, brings the instant putative class action against Defendants Piedmont Lithium, Inc. ("Piedmont"), Keith D. Phillips ("Phillips"), and Bruce Czachor ("Czachor") (collectively, "Defendants"), asserting violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  In brief, Plaintiff alleges that Defendants made misleading positive statements in connection with a North Carolina lithium mining project and subsequently sold stock between June 14, 2018, and July 19, 2021, prior to the release of a negative news article.  Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's amended complaint ("Am. Compl.") in its entirety.  For the reasons that follow, the amended complaint is dismissed.

## BACKGROUND[1]

Piedmont is an early-stage project company focused on developing an integrated lithium business.  (Am. Compl. ¶¶ 2, 18, 29.)  At all times relevant to the instant action, Keith D. Phillips served as Piedmont's President and Chief Executive Officer, and Bruce Czachor served as Piedmont's Vice President and General Counsel.  (*Id.* ¶¶ 19–20.)  Piedmont holds a 100% interest in a lithium project located in Gaston County, North Carolina, within the Carolina Tin-Spodumene Belt (the "Project").  (*Id.* ¶¶ 2, 18, 29.)  After securing exploration rights and land in this region in

---

[1] The following facts are taken from the amended complaint and are assumed to be true for the purpose of this memorandum and order, unless otherwise indicated.

2016, Piedmont planned, through the Project, to convert local spodumene—a mineral that contains lithium—into battery-grade lithium hydroxide, a critical component used for electric vehicle manufacturing.  (*Id.* ¶¶ 30-33.)  The process entails using an open-pit mine and a concentrator to extract and process spodumene, then using a lithium hydroxide chemical plant to convert spodumene concentrate into lithium hydroxide.  (*Id.* at ¶¶ 3, 30.)

## I.   Required State Mining Permit and Rezoning Applications

Piedmont retained HDR Engineering, a company that completed a critical issues analysis of the Project in February 2018 which identified certain steps Piedmont had to take before it could commence the Project.  (Am. Compl. ¶¶ 32, 36.)  For example, Piedmont had to complete exploration drilling on its initial land positions, secure additional land leases for further exploration, undertake technical studies to assess the economic potential of the Project, and complete certain financing activities.  (*Id.* ¶ 32.)  In addition, and of particular relevance here, Piedmont had to obtain certain federal, state, and local permits.  (*Id.* ¶ 4.)

The HDR Engineering analysis identified the relevant federal, state, and local permits Piedmont needed for the Project to commence.  (*Id.*)  Piedmont had to obtain a state mining permit from the North Carolina Department of Environmental Quality ("DEQ") Division of Energy, Mineral, and Land Resources to operate the mine.  (*Id.* ¶¶ 4, 32, 35, 37.)  Although Piedmont had already received a general permit from the North Carolina DEQ for drilling exploration activities, under North Carolina state law a prospective mining operator must also submit an application to obtain an operating permit covering the affected land.  (*Id.* ¶¶ 4, 37.)  The application must detail the materials to be mined, the method of mining, the expected depth and size of the mine, and the intended plan for mine reclamation and must include mine maps showing property lines where the

2

proposed mining activity will take place.  (*Id.* ¶ 38.)  The DEQ also recommends that applicants schedule a pre-application meeting in advance of applying.  (*Id.* ¶ 39.)

Additionally, Piedmont had to obtain zoning approval for the mine and concentrator property from the Gaston County Board of Commissioners (the "Commissioners").  (*Id.* ¶¶ 4, 32, 35.)  The Commissioners appoint members to the Planning Board, which conducts the rezoning review process and can make recommendations on rezoning applications that the Commissioners review.  (*Id.* ¶¶ 43-44.)  If the Planning Board does not make a recommendation, the application is forwarded to the Commissioners without one, and the Commissioners can either fully approve, approve with modifications, or deny a rezoning application.  (*Id.* ¶ 45.)  Alternatively, the Commissioners can also decide to submit the application to the Planning Board for further review and to write a report to the Commissioners.  (*Id.* ¶ 45.)

In the summer of 2018, Plaintiff alleges that Defendants began issuing positive statements about the Project and the associated permitting and rezoning process.  (*Id.* ¶ 47.)  On June 14, 2018, Piedmont stated that the Project will benefit from strong local government support.  (*Id.*)  In September 2018, Defendants informed investors that the Project's mine and concentrator property would need to be rezoned from agricultural use to industrial use and that Piedmont held meetings with county officials.  (*Id.* ¶ 49.)  In July and September 2018, Defendants also represented that the state mining permit application would be submitted by April 2019, and in August 2019 and early 2020, Defendants represented that their mining permit and rezoning applications would be submitted in the coming months.  (*Id.* ¶¶ 48, 51-52.)

## II.  Piedmont Public Offerings

Between June 2020 and March 2021, Piedmont raised approximately $193 million through various public equity offerings to be used to develop the Project.  (*Id.* ¶ 7.)  Piedmont completed

public equity offerings through shelf-registration statements filed with the SEC on F-3 Forms and final prospectuses filed with the SEC on 424B5 Forms in June 2020, October 2020, and March 2021, (collectively, the "Registration Statements"), generating aggregate gross proceeds totaling $13 million, $57.5 million, and $122.5 million, respectively.  (*Id.* ¶¶ 55, 57-58.)  Piedmont stated that it intended to use the net proceeds from these public equity offerings to continue to develop the Project, including permitting.  (*Id.* ¶¶ 55, 57-58.)

On September 28, 2020, Piedmont also announced that it reached an agreement with Tesla, Inc. ("Tesla") where Piedmont would supply Tesla with spodumene concentrate over a five-year term, with an option for a second five-year term, so long as deliveries would start between July 2022 and July 2023.  (*Id.* ¶¶ 7, 56.)

## III.  Piedmont's Leadership Team

In his capacity as General Counsel, Czachor was responsible for signing all of Piedmont's 6-K forms between June 14, 2018, and July 19, 2021 (the "Class Period").  (*Id.* ¶¶ 71, 81, 83–84, 88, 93-94, and 97.)  As senior executives, Phillips and Czachor attended management and/or board of director meetings and committees concerning Piedmont-related activities and made statements on behalf of Piedmont.  (*Id.* ¶¶ 22, 125.)  As alleged, the Individual Defendants "were privy to confidential and proprietary information concerning Piedmont and its operations, finances, financial condition, and present and future business prospects," and "had access to material, adverse, non-public information concerning Piedmont via internal corporate documents, conversations and connections with other corporate officers and employees . . . and via reports and other information provided to them in connection therewith."  (*Id.* ¶ 22.)

Between July 5 and July 6 of 2021, Defendant Phillips and non-party Patrick Brindle ("Brindle"), a project manager, completed their first reported sales of Piedmont stock, selling approximately $3.46 million worth of their personally-held Piedmont stock.  (*Id.* ¶ 8.)

## IV.  July 20, 2021 *Reuters* Article

Three weeks later, on July 20, 2021, a *Reuters* article reported that Piedmont had not yet spoken with or presented information to the Commissioners about the Project, that five out of seven Commissioners stated they may block or delay the Project, and that the Project did not benefit from strong local government support.  (*Id.* ¶¶ 9, 59.)  The article also stated that Piedmont had not yet applied for a state mining permit or zoning variance, that Piedmont needed to have a state mining permit before it could even apply for rezoning, and that Piedmont's application timelines were unrealistic.  (*Id.* ¶¶ 9-11.)  That same day, Piedmont presented the Project to the Commissioners for the first time.  (*Id.* ¶¶ 8, 60-61.)  By the end of the day on July 20, Piedmont's stock price had fallen nearly 20%.  (*Id.* ¶¶ 12, 60.)

Plaintiff alleges that Defendants made numerous misleading and false public statements to Piedmont's investors in SEC filings during the Class Period.  These statements are categorized as follows: (1) Piedmont had strong local government support for the Project; (2) Piedmont was actively engaged in discussions with relevant authorities regarding necessary zoning changes for the Project; and (3) Piedmont would file for the necessary North Carolina state mining permit and zoning variance within its stated timelines.  (*Id.* ¶ 5.)  Plaintiff alleges that these statements were materially false and misleading because Defendants knew or recklessly disregarded, but failed to disclose, that they did not have local support with the Project, did not consult or plan to consult the Commissioners about the Project, and had not taken the necessary steps to timely obtain or file

the required applications for permitting and rezoning. (*Id.* ¶¶ 59, 68, 70, 72, 74, 76-78, 80 and 105.)

## STANDARD OF REVIEW

Generally, to withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* With respect to claims alleging fraud, however, Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

In addition to the requirements of Rule 9(b), a plaintiff seeking to avoid dismissal of a securities complaint must also satisfy the pleading requirements included in the Private Securities Litigation Reform Act ("PSLRA"). *S. Cherry St., LLC v. Hennessey Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009). Congress enacted the PSLRA in 1995 in part "[a]s a check against abusive litigation by private parties." *Id.* at 111. To accomplish this goal, Section 21D(b)(2) of the PSLRA, codified at 15 U.S.C. § 78u–4(b)(2), provides that:

> [i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*Id.*

**DISCUSSION**

**I.   Exchange Act Section 10(b) and Rule 10b-5**

To succeed on a claim brought under § 10(b) and Rule 10b–5, a plaintiff must "establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'"  *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase et al.*, 553 F.3d 187, 197 (2d Cir. 2009).

Defendants contend that Plaintiff's amended complaint should be dismissed because (1) Plaintiff's claims premised on forward-looking statements are precluded under the PSLRA and the bespeaks caution doctrine; (2) Plaintiff fails to allege any actionable misstatement or omission; (3) Plaintiff fails to plead facts to demonstrate that Defendants acted with scienter; and (4) Plaintiff fails to plead loss causation.  (Memorandum of Law in Support of Defendants' Motion to Dismiss, ECF 48-1 ("Defs.' Mem.") at 12–25).

**A.   Scienter**

Under the PSLRA, a plaintiff must plead "with particularity facts giving rise to a *strong* inference that the defendant acted with the requisite state of mind."  *ECA*, 553 F.3d at 198 (emphasis in original).  The "requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'"  *Id.* at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007)).  Courts in this Circuit have also found that "recklessness" also suffices.  *Id.*  Therefore, a plaintiff may sufficiently plead scienter by alleging facts to show either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  The Court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in original).  A "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (citations omitted).

### 1.   Motive and Opportunity Based on Purported "Unusual" Insider Stock Sales

To sufficiently allege a motive that supports the inference of fraudulent intent, a plaintiff must plead that there was a "concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d. Cir. 2001).  "Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  However, the "opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer."  *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 136 (E.D.N.Y. 2020).  Motives such as a "desire for the corporation to appear profitable . . . [or] to keep stock prices high to increase officer compensation" are insufficient, but allegations "that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares" are sufficient.  *Id.*  (citations omitted).

"Unusual" insider sales "at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d. Cir. 2001).  To determine whether insider sales are "unusual," courts consider a variety of factors, including: (1) the profit from the sales; (2) the portion of stockholdings sold; (3) the change in volume of an insider's sales; (4) the number of insiders selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before certain corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans.  *Id.*  ("Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion

of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.");
*see also Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (collecting cases); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) ("Whether trading was unusual or suspicious turns on factors including . . . (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans, such as Rule 10b5-1 plans.").

Defendants primarily argue that Plaintiff fails to plead any motive to defraud because the alleged insider sales were small percentages in comparison to the insiders' total holdings.  (Defs.' Mem. at 20.)  Defendants also argue that Plaintiff fails to allege that one of the individual defendants sold stock, which they contend undermines any inference of scienter.  (*Id*.)  The Court agrees.

### i.  No Net Profit is Alleged

To start, and as Defendants point out, Plaintiff only alleges how much Defendant Phillips and non-party Brindle received in *gross proceeds*, not how much they each received in net profits. (Defs.' Mem. at 21 n.11.)  District courts have found allegations of gross proceeds reaped from insider sales to be insufficient where a plaintiff fails to identify the corresponding net profits.  *See, e.g.*, *Gentiva*, 932 F. Supp. 2d at 381 (determining that the plaintiff's allegations that the individual defendants collectively sold approximately 292,000 shares for $7.1 million in proceeds was insufficient because the complaint only identified reaped proceeds and not net profits); *see also Glaser*, 772 F. Supp. 2d at 587 (stating that plaintiffs' allegations of insider stock sales fail, in part, "because the allegations only demonstrate gross proceeds without identifying net profits, and proceeds alone say nothing about a seller's motive"); *In re Take- Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008) (finding that two individual defendants' combined proceeds

of $2.8 million from stock sales is insufficient to establish scienter, particularly because plaintiffs fail to plead whether either made any profit from the sales).

In response, Plaintiff argues in one sentence within a footnote that their allegations concerning gross proceeds do not preclude a finding of scienter, relying on *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). (Pl.'s Opp'n at 23 n.18.) However, Plaintiff's description of the Second Circuit's finding of scienter in *Scholastic* is incomplete. In *Scholastic* the Second Circuit stated that although $1.25 million in gross proceeds is not an unusual amount by itself and cannot on its own support an inference of scienter, the "percentage of stock holdings sold may be indicative of unusual trading." 252 F.3d at 74. Considering the totality of the circumstances, the Second Circuit found that the defendant's sale of a high percentage of his stock holdings (80%) for $1.25 million within a matter of days after not having sold stock at least a year, was indicative of unusual trading activity. *Id.* Notably, the totality of the circumstances presented in *Scholastic* do not exist here. As discussed further below, the percentages of defendants' stockholdings sold (13.19% and 31.93%) are not nearly as a high as the *Scholastic* defendant's 80%.

### ii. Percentage of Insider Stock Sold

The Second Circuit has stated that "large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened." *Rothman v. Gregor*, 220 F.3d 81, 95 (2d Cir. 2000); s*ee, e.g., In re Travelzoo Inc. Sec. Litig.*, 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013) (finding that an individual defendant's sale of 22% of stockholdings is not "unusual" because he still retained 78% of his total stockholdings despite a total of $186 million in sales). Here, Defendant Phillips's sale of 13.19% is a small fraction of his total share shares in Piedmont. (Am. Compl. ¶ 134). Furthermore, non-party Brindle's sale of 31.93% of his shares is of limited value to Plaintiff's

scienter argument.[2]  *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 97 (S.D.N.Y. 2022) (finding that although "transactions of [] non-party officers could hypothetically have some bearing when considering the scienter allegations holistically and collectively . . . they do not go toward the motive and opportunity of any defendant.").

While Plaintiff contends that other courts have considered lower percentages of stock sales than the ones at issue here to be unusual, Plaintiff's cited authorities are distinguishable.  (Pl.'s Opp'n at 23.)  Plaintiff relies on a single case from a court in this Circuit, *In re Oxford Health Plans*, 187 F.R.D. 133, 139-140 (S.D.N.Y. 1999), as an example of a case where the sale of 11% of an insider's stock was deemed sufficient to establish unusual or suspicious insider trading activity.  (Pl.'s Opp'n at 23.)  However, that percentage did not independently support a finding of scienter in *Oxford Health Plans*.  Rather, the district court ultimately found a strong inference of scienter based upon the range in volume of the individual defendants' insider trades combined with "other allegations" and "further evidence." *Id.* at 139-140.  The court in *Oxford Health Plans*, presented with allegations concerning the total sale of 1,200,000 shares of company stock totaling a "massive" $78 million in profit, made a finding of scienter based on a litany of factors, including the individual defendants' large net profits from these sales, the percentage of holdings at *two* separate periods of time ranging from 17% to 67% in 1996 and 11% to 100% in 1997, and the suspicious timing of the sales.[3]  *Id.*

---

[2] Plaintiff's reliance on *Gelt Trading, Ltd. V. Co-Diagnostics, Inc.*, 2022 WL 716653, at *9 (D. Utah Mar. 9, 2022) to support the proposition that transactions of a non-party can support scienter for purposes of motive and opportunity is unhelpful.  Not only is this case outside this district and not binding on this Court, but *Gelt Trading* did not base a finding of scienter on the actions of non-parties.  In *Gelt Trading*, the court noted in its scienter analysis that "multiple board members [who] sold significant amounts of stock just as news outlets began to question the accuracy of [the company's] test"—but the only sales by board members specifically alleged by plaintiff were by two named defendants, not non-parties.  *Id.* at *8.

[3] Plaintiff also cites to *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000), a case outside of this district and not binding on this Court.  But the district court there concluded that the allegations of the individual defendants' sales of stock ranging from 11% to 40%, "combined with the allegations of serious accounting errors which inflated the value of the stock, support a strong inference of scienter." *Id.* at 542.

The same totality or combination of allegations concerning insider sales in the instant case does not lead the Court to the same conclusion that was reached in *Oxford Health Plans* and *SmarTalk*. Both of those cases featured several individual defendants (five and ten, respectively) who sold varying percentages of stock—whereas in this case, only one of two defendants is alleged to have sold a small percentage of his shares.

Even in considering the gross proceeds figures of both Defendant Phillips and non-party Bindle, 46,080 shares were sold for approximately $3.46 million, which is less than 5% of the $78 million in profits reaped by the *Oxford Health Plans* defendants on their 1.2 million shares. Nor do the individual gross proceeds of $1.97 million and $1.49 million compare to the "massive" net profits reaped by most of the individual defendants in *Oxford Health Plans*.

Moreover, Defendants argue that Plaintiff fails to allege that Defendant Czachor, the general counsel of Piedmont, sold *any* Piedmont shares and that this is a "dispositive factor" that precludes a finding of scienter as to any defendant. (Defs.' Mem. at 21.) "[T]he sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent," particularly where other individual defendants do not sell any of their stock. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[W]e conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *see also Gentiva*, 932 F. Supp. 2d at 382 (plaintiff "failed to sufficiently allege motive and opportunity as to any defendant" where "one of the Individual Defendants . . . [wa]s not alleged to have sold any [company] stock during the class period") (collecting cases).

For example, in *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006), two individual defendants who were company executives sold 17.4% and 10.9% of their holdings during the class period.  The district court found that these sales, considered separately, were insufficient to establish motive as to these two defendants, particularly because the complaint omitted information concerning both the percentage increase in each defendant's holdings during the class period and whether any profits were gained from the sales.  *Id.* at 290-91.  The district court also found that plaintiffs failed to allege motive and opportunity as to any defendant because it found "dispositive" that two other individual defendant insiders, who were the Chairman and CEO and a Senior Vice President and CFO, did not sell during the class period.  *Id.* at 291.  The court found that the lack of sales by these two defendants undermined the any inference of scienter. *Id.* at 291.

Here, Defendant Phillips sold a percentage of stock that was either close to or less than both individual defendants in *eSpeed*, and Plaintiff here failed to disclose whether Defendant Phillips made a profit from these sales.  Additionally, Defendant Czachor, like the corporate insiders in *eSpeed*, is not alleged to have sold stock despite being a top Piedmont executive and having signed off on many of the alleged misstatements during the class period.  (*See, e.g.*, Am. Compl. ¶¶ 71, 81, 83-84, 88, 93-94, 97.)  The absence of any alleged sales by Defendant Czachor undermines a finding of scienter here.

The cases Plaintiff cites in opposition to this point are not availing.  Plaintiff refers the Court to *Gentiva*, 971 F. Supp. 2d at 327, for the proposition that a finding of scienter is not precluded even if an individual defendant did not sell stock.  (Pl.'s Opp'n at 23 n. 18.)  But that case is distinguishable.  In *Gentiva*, the district court found that scienter was pleaded as to two individual defendants, who sold 98% and 96% of their shares, because although another

defendant's decision to not sell stock during the class period cuts against an inference of scienter, the alleged "net proceeds" and volume of trading activity support a compelling inference of scienter. *Id.* at 326-328. Specifically, plaintiff alleged that during the class period, one defendant held 15,357 shares of common stock, acquired 146,775 shares through the exercise or conversion of stock options, and sold 99% of his shares for net proceeds of $2.14 million, with 63,018 shares worth of sales taking place in the six months leading up to the negative disclosure. *Id.* at 326. The other defendant acquired 120,505 shares through the exercise or conversion of options and sold 96% of the shares for net proceeds of $1.8 million, with 95,883 shares worth of sales taking place in the six months leading up to the negative disclosure. *Id.*

There are no equivalent facts here warranting the same conclusion. Defendant Phillips sold 13.19% of his shares, which is dramatically lower than the over 95% of stock sales that the two individual defendants in *Gentiva* completed. In addition, there are no allegations as to the net proceeds or profits from Defendant Phillips' or Brindle's sales. Furthermore, the volume of trading activity alleged in *Gentiva* is not present here as Defendant Phillips and non-party Brindle each are alleged to have sold their shares for the first time.[4]

### iii. Timing of the Stock Sales

Alternatively, Plaintiff contends that the insider stock sales alleged here are unusual not only based on the amount, but also based on the timing of the sales. (Pl.'s Opp'n at 23.) Plaintiff alleges that Defendant Phillips sold approximately 13.19% of his personally-held Piedmont shares

---

[4] Plaintiff also relies on a case outside this Circuit, *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). However, in that case the Ninth Circuit found that although some officers who did not make misleading statements did not sell stock during the class period, plaintiffs' other allegations concerning these officers were sufficient to establish scienter. *Teamster*, 320 F.3d at 944. For example, plaintiffs asserted that three defendants were motivated to inflate company financial results and stock prices because their eligibility for stock options and executive bonuses were based on the company's financial performance. *Id.* Plaintiffs also asserted that these individuals received options during the class period when in the previous year they received no option awards. *Id.* The same allegations are not present here.

over two days, reaping approximately $1.97 million in gross proceeds, and non-party Patrick Brindle sold approximately 31.93% of his Piedmont shares in one day, receiving $1.49 million in gross proceeds.  (Am. Compl. ¶ 134.)  Plaintiff claims that Phillips' and Brindle's transactions were "highly unusual" because they were the first reported company sales by each defendant, and because the timing of these sales was a "mere two weeks" before the *Reuters* article was released and before they presented the Project to the Commissioners.  (Am. Compl. ¶ 134; Pl.'s Opp'n at 22.)

Trades that were made shortly before a negative public announcement can be deemed suspiciously timed. *Oxford Health Plans*, 187 F.R.D. at 139.  Here, it is notable that the insiders' first-ever sales of their shares occurred almost three weeks before the materialization of the alleged risk with the publishing of the *Reuters* article on July 20, 2021.  However, this is just one factor of many that the Court must consider in assessing whether the sales are considered "unusual," and the other allegations in this case do not weigh in favor of a finding of scienter.

Indeed, the cases Plaintiff relies on for its timing argument are distinguishable.   In *Scholastic*, the district court's analysis primarily focused on the sole individual defendant's sale of 80% of his stockholdings.  252 F.3d at 75.  Here, by contrast, Defendant Phillips sold less than a quarter of that amount.

Plaintiff's reliance on *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d at 457 (S.D.N.Y. 2013) is also misplaced.  In *Van Dongen*, the plaintiff alleged that during the class period, company insiders sold 1.3 million shares for proceeds exceeding $34 million.  The plaintiff also alleged that at least two insiders received more than $25 million before an impactful analyst report was published, and two other non-party executives gained $14 million in proceeds from sales that occurred after the report was published.  *Id.* at 475.  The district court determined that the sales by

two individual defendants, although not tied to analyst reports, were unusual based on their comparative size and because one was responsible for misstatements and omissions both early and late in the class period.  *Id.*  The district court also found that the fact that multiple company executives sold stock outweighs the fact that one did not.  *Id.*  The district court was persuaded that a combination of the circumstances tipped the balance in favor of finding that plaintiffs adequately pleaded motive and opportunity.  *Id.* at 476.

The same circumstances do not exist in the instant case.  Unlike in *Van Dongen*, here, the stock sales only occurred at the end of the Class Period, the absence of sales by Czachor is not outweighed by multiple other insider sales, and the sales and proceeds gained by Phillips and Brindle were comparatively much lower.

### iv.  Piedmont's Strategic Investments in Other Lithium Projects

Though Defendants argue that the quantities and timing stock sales themselves were insufficient to give rise to scienter, they fail to address two additional purported bases for scienter offered by Plaintiff: Piedmont's ongoing equity offerings and contract negotiations with Tesla.

Plaintiff asserts that Defendants were motivated to raise money via equity offerings while Piedmont's stock was artificially inflated, and that Defendants' positive misleading statements and unrealistic timetables enabled it to enter into a contract with Tesla.  (Pl.'s Opp'n at 23-24.)  But Plaintiff fails to explain how either of these allegations or assertions would support a finding of scienter.

First, Plaintiff avers that Piedmont's allegedly misleading statements regarding the Project allowed Piedmont to raise $193 million through various public equity offerings to be used for strategic investments in "other projects."  (Am. Compl. ¶¶ 7, 26, 54-58, 129.).  However, allegations regarding the desire to raise capital are generally inadequate to plead scienter.  *In re Plug Power, Inc. Sec. Litig.*, No. 21 CIV. 2004 (ER), 2022 WL 4631892, at *34 (S.D.N.Y. Sept.

16

29, 2022) ("Defendants' alleged desire to raise capital from conducting offerings […] is not evidence of scienter."). Moreover, Plaintiff fails to allege how any positive statements about the Project at issue has any connection with Defendants' other lithium projects such that Defendants would have a motive to make alleged misleading statements to inflate the stock price.

Plaintiff's argument with respect to the Tesla agreement fares no better. Plaintiff argues that Defendants' alleged misstatements allowed Piedmont to close a deal with Tesla. (Am. Compl. ¶¶ 26, 56). This argument is likewise unavailing: a defendant's "desire to enter into transactions on favorable terms" is generally not "sufficient to establish scienter." *In re Plug Power*, 2022 WL 4631892, at *35. Plaintiff has not plead sufficiently particularized facts to establish the Tesla deal as a motive for securities fraud. *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 490-91 (S.D.N.Y. 2021) ("Plaintiffs do not plead any particularized facts to support their motive allegation, such as facts demonstrating that the inflation of Quad's stock price was necessary to consummate the LSC acquisition.").

Furthermore, Piedmont's agreement with Tesla to supply spodumene concentrate was announced in 2020 and was conditioned on Piedmont and Tesla agreeing to start deliveries between July 2022 and July 2023. (Am. Compl. ¶ 56.) The negotiation of this conditional agreement—with conditions that could not be satisfied for at least two to three years—does not provide sufficient motive for Defendants to allegedly conceal the status of the permitting and rezoning plans and lack of community engagement even drawing all inferences favorable to Plaintiff.

Plaintiff's cited cases do not sway the Court either. In *In re Time Warner*, defendant company had $10 billion in debt and implemented a campaign to find international strategic partners to infuse billions of dollars of capital into the company to help resolve that debt. *In re*

*Time Warner,* 9 F.3d 259, 262 (2d Cir. 1993).  Through that campaign, defendant only formed two strategic partnerships, and therefore actively considered an alternative method of raising capital through a new stock offering that would dilute the rights of the existing shareholders.  *Id.*  Once the offering proposals were announced, the price stock dropped.  *Id.*  Plaintiffs alleged that defendants misrepresented the status of the ongoing strategic partnership discussions and failed to disclose that defendants actively considered a stock offering as an alternative.  *Id.*  With respect to scienter, although the district court found that plaintiffs failed to adequately plead motive, the Second Circuit reversed.  *Id.* at 269.  The Second Circuit determined that plaintiffs sufficiently alleged that defendants were motivated to misrepresent the status of the strategic alliance negotiations to avoid endangering meetings with prospective partners, and also withheld the disclosure of its consideration of a rights offering to maintain a high stock price.  *Id.* at 269.

Plaintiff cites this case for the proposition that courts have found motive when disclosure would have lessened the stock's value prior to an upcoming offering.  However, the issue in *Time Warner* was the *failure* to disclose the active consideration of a stock offering in order to inflate or enhance the company's stock price—an allegation that Plaintiff has not made here.

*Van Dongen* is also distinguishable because although the district court did find that a secondary offering could provide a motive for fraud, the district court made clear that this allegation along with other allegations plaintiffs raised, "standing alone," did not create a strong inference of scienter, but that collectively the allegations raised did.  *Van Dongen,* 951 F. Supp. 2d at 474.  Here, Plaintiff's allegations taken together fall short.

### 2.  Conscious Misbehavior and Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142

(2d Cir. 2001).  Recklessness, which in this context means "a state of mind approximating actual intent, and not merely a heightened form of negligence," can also support a securities fraud claim. *S. Cherry St., LLC*, 573 F.3d at 109.  "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  To constitute recklessness, the conduct must be "at the least . . . highly unreasonable and . . . represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it . . . ."  *S. Cherry St., LLC*, 573 F.3d at 109 (internal quotations and citations omitted).  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'"  *Employees' Ret. Sys. Of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation omitted).

### i.  Group Pleading

Defendants argue that Plaintiff fails to allege facts giving rise to a strong inference of scienter for each defendant.  (Defs.' Mem. at 22.)  Specifically, Defendants claim that Plaintiff pleads generalized, conclusory allegations that Piedmont and the Individual Defendants, as a group, had actual knowledge of the misrepresentations and omissions of material facts, or acted with reckless disregard for the truth.  (*Id.*)  Defendants claim that instead Plaintiff must plead facts that would give rise to a strong inference of scienter for each defendant.  (*Id.*)  Plaintiff does not respond to this argument.

19

Defendants rely on *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at \*20 (S.D.N.Y. Oct. 25, 2006).   There, plaintiff alleged that two individual defendants had access to adverse undisclosed information via internal documents, conversations with other corporate officers, attendance at board meetings, and reports.  *Id.*  Plaintiff also alleged that both defendants were directly involved in the day-to-day operations of the company at the highest levels and were privy to confidential proprietary information concerning the company and its business, operations, financial statements, and financial conditions.  *Id.*  The district court found that as to one individual defendant, the generalized group pleading allegations of his knowledge and access to information, without any differentiation between him and the other individual defendant, were insufficient to establish his conscious misbehavior or recklessness.  *Id.*

Here, Plaintiff's allegations as to Defendant Czachor are similar to those alleged in *Yukos* and fail for the same reasons.  To start, the amended complaint references Czachor ten times, and those allegations only concern Czachor's position as Piedmont's Vice President and General Counsel during the Class Period and that he signed several company SEC filings in July, September and December of 2018 and May, June and September of 2019.  (Am. Compl. ¶¶ 20-21, 71, 81, 83-84, 88, 93-94 and 97.)    The other allegations concerning Defendant Czachor take the form of generalized allegations regarding both Individual Defendants.  For example, like plaintiffs in *Yukos*, Plaintiff alleges that the Individual Defendants, "as senior executive officers and/or directors of Piedmont," were "privy to confidential and proprietary information concerning Piedmont and its operations, finances, financial condition, and present and future business prospects."  (Am. Compl. ¶ 22.)  Plaintiff further alleges that the Individual Defendants had "access to material, adverse non-public information concerning Piedmont via internal corporate documents, conversations and connections with other corporate officers and employees,

attendance at management and/or board of directors meetings and committees . . . and via reports and other information provided to them in connection therewith." (*Id.*)   The amended complaint goes on to allege that because of "their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts" had not yet been disclosed and were concealed from the public.  (Am. Compl. ¶¶ 125; 136-137.)  These allegations are clearly insufficient to establish Defendant Czachor's recklessness of conscious misbehavior because there is no differentiation between him and Defendant Phillips.

The fact that Defendant Czachor signed certain SEC filings does not salvage Plaintiff's deficient allegations of scienter as to him.  *See Behrendsen v. Yangtze River Port and Logistics Ltd.*, 2021 WL 2646353, at *12 (E.D.N.Y. June 28, 2021) (rejecting plaintiffs' allegations that defendants who signed group-published documents, such as SEC filings and Sarbanes-Oxley certifications attesting to the accuracy of the SEC filings, does not "compel a conclusion that all of the signatories were aware" that the document was misleading) (citations omitted); *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304 (S.D.N.Y. 2008) (concluding that the presence of the CFO's signature on relevant SEC filings that allegedly contained certain misstatements does not give rise to a strong inference of scienter).

### ii.  Individual Defendants' Positions and Access to Information

Defendants claim that Plaintiff improperly relies on the Individual Defendants' positions to presume that they had knowledge of the alleged misstatements' falsity.  (Defs.' Mem. at 22-23.) Defendants also claim that Plaintiff fails to allege that Defendants knew of any facts or had access to information that contradicted their public statements at the time the statements were made.  (*Id.*)

It is well settled in this Circuit that allegations based on a defendant's corporate position alone should not be given weight.  *See, e.g.*, *Woodley v. Wood*, 2022 WL 103563, at *7 (S.D.N.Y. Jan. 11, 2022) ("Courts in this Circuit have long held that accusations founded on nothing more

than a defendant's corporate position are entitled to no weight.") (citation omitted) (collecting cases); *see also Johnson v. Siemens AG*, 2011 WL 1304627, at *15 (E.D.N.Y. Mar. 31, 2011) ("To establish an inference of scienter, lead plaintiff must do more than allege that the individual defendants or other [company] officers had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, their general responsibility for monitoring [the company's] activities, and their access to insider information."). Nor do bald allegations of access to information support an inference of scienter without more. *See Chen v. X Fin.*, 2021 WL 7449851, at *11 (E.D.N.Y. Dec. 9, 2021) (rejecting plaintiffs' claim that scienter was established by the management defendants' access to adverse information in public filings and documents because they were vague and conclusory and do not connect the contradictory information to management).

In addition, the Second Circuit has clearly stated that where a plaintiff "contend[s] defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *see also Chen v. X Fin.*, 2021 WL 7449851, at *11 (E.D.N.Y. Dec. 9, 2021) (finding that plaintiffs failed to establish scienter in part because plaintiffs failed to identify contemporaneous reports contrary to the defendants' public statements, or that defendants received information contrary to their public declarations); *Johnson v. Siemens AG*, No. 09-cv-5310, 2011 WL 1304627, at *15 (E.D.N.Y. Mar. 31, 2011) ("[L]ead plaintiff must 'specifically identify . . . reports or statements' that were provided to [company] management, that contained facts contrary to the defendants' public statements, and that defendants recklessly ignored or intentionally concealed in making those statements.") (citing to *Novak*, 216 F.3d at 309).

In this case, Plaintiff fails to identify any contemporaneous reports or statements that contradict Defendants' public statements.  Instead, Plaintiff directs the Court to the HDR Engineering critical issues analysis completed in February 2018 identifying the local, state, and federal permits Piedmont needed to commence mining and concentrator activities, which was four months *prior* to the start of the Class Period.  (Am. Compl. ¶¶ 36, 79, 82, 126, 139; Pl.'s Opp'n at 18.)  However, this tells the Court nothing about what Plaintiff claims is the "true state of affairs" of the permitting process, or even what the steps Piedmont had and had not completed were.  (*Id.*)  All the critical issues analysis shows is that Defendants knew permits were required to commence the Project.

In addition, Plaintiff contends that Defendant Phillips made certain statements admitting Piedmont's awareness of the Commissioners' importance and role in the Project, and that these statements demonstrate knowledge of the steps Piedmont took.  (Pl.'s Opp'n at 19.)  Specifically, Plaintiff relies on Defendant Phillips' statements at a presentation of the Project to the Commissioners that "[w]e've known from day one, we can't do anything without [the commissioners] rezoning this property – full stop," that "[w]e can't do anything without . . . receiving a North Carolina state mining permit – we've known that all along," and that "we weren't ready to present in March.  We didn't know our plans and very important components that are now part of our plan weren't finalized then." (Am. Compl. ¶¶ 46, 61-63.)  However, as Plaintiff alleges in the Amended Complaint, these statements were made *after* the Class Period ended, and thus are not contemporaneous reports or statements that contradict Defendants' other public statements about projected timetables to meet zoning and permitting requirements.  (*Id.* at 61; Defs.' Mem. at 23.)  Furthermore, the cases Plaintiff cites to support this argument are distinguishable: in those

cases, the defendants were alleged to have known the exact same information that they allegedly misrepresented.

### iii. Permits and Rezoning Timelines

Defendants contend that their public statements about the then-projected timetable for obtaining permits and rezoning approvals were based on a good-faith belief, even if inaccurate. (Defs.' Mem. at 23.) On this point, Defendants refer the Court to two instructive cases.

*First*, Defendants cite to *Russo v. Bruce*, 777 F. Supp. 2d 505 (S.D.N.Y. 2011). There, defendant gold mining company and its executives entered into a mining operation agreement with Venezuela's state-owned mining enterprise, which granted defendant the right to conduct mining operations in a certain city. *Id.* at 511. Defendants' right to mine was contingent on obtaining certain permits from the Venezuelan government and funding social welfare projects in the region where defendant intended to mine. *Id.* Plaintiffs alleged that defendants misled plaintiffs regarding the status of its application for a final permit while knowing or recklessly disregarding their nonexistent prospects for success in getting approval. *Id.* For example, one defendant touted in a press release that the defendant company anticipated receiving the permit in the "near term." *Id.* Defendants also repeatedly stated that they were not aware of any impediments to granting the permit and that the defendant company was "closer than it had ever been before" to getting a permit. *Id.* at 512 (internal quotations omitted). Ultimately, defendants' request for the final permit was rejected and defendant company's stock dropped. *Id.* The district court ruled in favor of defendants. *Id.* at 515. The district court stated that corporate officials do not act recklessly just because executives made optimistic projections that failed to materialize and that misguided optimism does not support an inference of fraud. *Id.* at 521. In applying these standards, the district court found that plaintiffs failed to particularize how and why defendants knew or were

reckless in not knowing that their statements about the final permit application were false. *Id.* at 521-522.

*Second*, in *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018), a development-stage biopharmaceutical company made public statements about the FDA approval process for and commercial distribution of an animal pharmaceutical. *Id.* at 743.  In receiving FDA approval, the company had to establish an investigational drug file with the FDA's Center for Veterinary Medicine ("CVM") and complete a lengthy approval process.  After the company took an early step in this process, defendants publicly stated multiple times that they either "plan[ned]" or "anticipate[d]" completing and submitting the administrative application "in time" to enable the company to receive approval for the pharmaceutical by 2016. *Id.* at 745-47. Defendants then revised their timeline, anticipating commercial availability of the drug to occur first in late-2016 and then in 2017. *Id.* at 748-749.  Plaintiffs allege that defendants' statements support an inference of scienter because defendants made them despite knowing that the timelines were unrealistic due to defendants' failure to secure a manufacturer capable of producing the drug on a commercial scale. *Id.* at 745.  However, the district court disagreed. *Id.* at 760.  The district court concluded that plaintiffs failed to allege that defendants disbelieved their own estimates as to the product's commercialization date, and that the "serial" revisions of the commercialization timeline do not demonstrate culpable knowledge. *Id.*

Like in these cases, Defendants' challenged statements here amount to nothing more than optimistic projections about the receipt of approval of the necessary permits and rezoning approval.  In 2018 and 2019, Defendants stated that they were unaware of any issues with the permitting process. (*See* Am. Compl. ¶ 69 ("The company is not aware of any reason why rezoning and CUP would not be granted"); *id*. ¶ 91 (Piedmont "remain[s] on-track to begin construction in

early-2020.")).  Defendants' timeline with respect to submitting the permitting submission also changed several times.  For example, Defendants first stated that they were "target[ing]" the permitting submission for late 2018.  (Am. Compl. ¶ 71.)  Then, the timeline changed to 2019 and Piedmont stated that it "expect[ed] to submit the balance of permit applications required . . . within the first half of 2019."  (Am. Compl. ¶ 75; *see also id*. ¶¶ 82-84, 89.)  Further revisions to this timeline were announced in August 2019, May 2020, and December 2020.  (Am. Compl. ¶ 95; *see also id*. ¶¶ 101-104.)  But, just as in *Aratana*, multiple revisions to a plan's timeline do not on their own demonstrate culpable state of mind.

Between 2018 and 2020, Defendants also explained that the permitting process was dependent on numerous variables out of their control.  Defendants stated that "[o]btaining and renewing governmental permits is a complex and time-consuming process" (Am. Compl. ¶ 85) that "involve[es] numerous jurisdiction, public hearings and possibly costly undertakings" (*id*.) that not only could "materially increase the costs and cause delays in the permitting process" (Am. Compl. ¶ 73) but also "could cause us to not process with the development or operation of the property" (*id*).  Defendants further stated that "[t]he timeliness and success of permitting efforts are contingent upon many variables not within our control."  (Am. Compl. ¶ 85; *see also id*. ¶ 86.)  On February 26, 2020, defendant Phillips stated that the Project would achieve "*shovel-ready status by the end of the year.*" (Am. Compl. ¶ 100.)  Like the plaintiffs in *Aratana* and *Russo*, Plaintiff here has failed to sufficiently allege how or why Defendants knew or were reckless in not knowing that their statements about the permitting and rezoning timelines were false, or that the changes in timelines demonstrated culpable conduct.

In response, Plaintiff argues that because the permitting applications were never filed, because the Defendants never met or consulted with the relevant local regulators, and because the Commissioners expressed frustration with non-party Piedmont employees about Piedmont's

approach to the Project, Defendants knew that its statements regarding the state mining permit and rezoning timelines were unrealistic and lacking in a reasonable basis.  (Pl.'s Opp'n at 18; Am. Compl. ¶¶ 130-131.)  However, just because Defendants allegedly had not yet filed the necessary applications does not mean that their statements about the projected timetable for the permitting approval process were misleading or false.  Furthermore, the Commissioners were just one set of regulators that Defendants had to meet with in the process, and Piedmont did hold meetings with other regulators, including those in the planning office.   (Am. Compl. ¶ 69.)  Defendants are not alleged to have made any misstatements about meeting with the Commissioners.  (*Id*.)

Additionally, the emails referenced in Plaintiff's amended complaint between non-party Piedmont employees and Commissioners during the Class Period at most illustrate that Piedmont did not properly inform the Commissioners about details concerning the Project.  (Am. Compl. ¶¶ 130-131.)  These emails do not demonstrate that Defendants were intentionally trying to conceal aspects about the Project or that the Project timelines for permitting and local support around the Project were unreasonable.

Finally, Plaintiff's reliance on *City of Austin Police Ret. Sys. V. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 307 (S.D.N.Y. 2013) as an example of a district court finding a defendant's statements about changes to the schedule of the construction of a mine reckless is misplaced. There, the district court found that the factors "most influencing" this determination were defendants' statement that there was "limited margin for error" with regard to the schedule, defendants' knowledge and announcement of a delay in the project and the fact that the length of the delay was nine months, and defendants' statements that the schedule was still on track despite the delay.  *Id*.  These overly optimistic projections simply do not exist here.

### 3. Core Operations Doctrine

Plaintiff argues that scienter is adequately plead through the "core operations doctrine," which imputes knowledge of a company's core operations to its senior level management. (Pl's Opp'n at 21.) Plaintiff asserts that during the relevant period, Piedmont only had approximately 30 employees and that the Project was its core asset. (Pl.'s Opp'n at 21.) Plaintiff avers that the core operations doctrine applies because Defendants knew about the necessary permitting from the February 2018 HDR Engineering critical issues analysis, Defendant Phillips' statements that the Commissioners needed to approve rezoning activities and that Piedmont needed a state mining permit, and Defendant Phillips' own awareness that he needed to present the Project to the Commissioners. (Pl.'s Opp'n at 22.) Plaintiff contends that all these allegations demonstrate that each individual defendant knew of, or had access to, information regarding the status of the required permits and rezoning activities. (*Id.* at 22.)

"Under the core operations doctrine, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts based on their positions within the company." *Zhong Zheng v. Pingtan Marine Enterprise Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (citation omitted). This doctrine typically applies where "the operation in question constitute[s] nearly all of a company's business." *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (citations omitted). However, as Defendants correctly point out, not only has the Second Circuit questioned whether the doctrine survived after the PSRLA was enacted, but even in considering core operations allegations, district courts in this circuit have found that such allegations cannot on their own establish scienter. *Zheng*, 379 F. Supp. 3d at 181 (citations omitted); *see also Frederick v. Mechel OAO*, 475 Fed. App'x 353, 356 (2d Cir. 2012) ("[W]e have

28

not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter."); *see also In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 222 n.9 (E.D.N.Y. 2022) ("After the PSLRA, however, courts do not accept this pleading strategy as the *sole* evidence of scienter; such an inference can only be additional evidence of scienter.") (collecting cases); *In re Hain Celestial Grp. Inc. Sec. Litig.*, No. 16-cv-4581, 2022 WL 18859055, at *1, *33 (E.D.N.Y. Nov. 4, 2022) (finding that plaintiffs' "reliance on the core operations doctrine is misplaced given that the [second amended complaint] fails to plead separate facts raising an inference of scienter to be supplemented by the core operations doctrine.").

Even assuming, as Plaintiff argues, that Piedmont was small in size, was a pre-revenue company, and that the Project was the exclusive focus and Piedmont's core asset, it is unclear from the Amended Complaint whether the Project constituted nearly all of Piedmont's business.  (Pl.'s Opp'n at 22.)  As Plaintiff alleges, Piedmont was a "pre-revenue early[-]stage project company" (Am. Compl. ¶ 29) and that before even embarking on the Project, Piedmont needed to obtain certain state and local permits and a zoning variance (Am. Compl. ¶ 4).  It is unclear how the Project consisted of the company's entire business if it was never launched during the relevant period.  Furthermore, even if the Project is considered an operation that consisted of Piedmont's entire business, Plaintiff still only alleges that Defendants knew that they needed certain permits, not that the projected timelines to receive the permits were unreasonable or unrealistic.  *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 817 (S.D.N.Y. 2018) (finding no scienter under the core operations doctrine where a plaintiff contended that a company project constituted a core operation based on the billions of dollars of resources poured into the project, high-level executive visits to the mine and frequent updates to investors about its progress, because plaintiffs only alleged that

defendants knew about a payment related to the project, not that they knew about an unlawful payment).

### B. Holistic Review

Alternatively, Plaintiff argues that the Court should holistically review the amended complaint to find that Plaintiff adequately pleaded scienter as mandated by *Tellabs* because it alleged that Defendants had a motive and opportunity to commit fraud, and because the Project was Piedmont's most important asset. (Pl.'s Opp'n at 24.)  It is true that under *Tellabs* a complaint would survive dismissal "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  551 U.S. 308, 324 (2007).  However, viewed holistically, Plaintiff has failed to adequately allege scienter based on the Court's findings that Plaintiff failed to adequately allege that Defendants had a motive and opportunity to defraud or that Defendants were reckless.  *See Kalnit v. Eichler* (holding that a plaintiff failed to allege scienter by combining "inadequate allegations of motive with inadequate allegations of recklessness."); *see also Reilly*, 2018 WL 3559089 at *19 ("[I]nadequate allegations of motive and inadequate allegations of recklessness cannot be combined to demonstrate scienter—zero plus zero cannot equal one.").

Accordingly, the Court cannot discern a strong inference of scienter, and Plaintiff's claims under the Exchange Act § 10(b) and Rule 10b-5 are therefore dismissed.[5]

---

[5] Plaintiff maintains that because Defendants do not challenge their allegations concerning corporate scienter, they have conceded them.  (Pl.'s Opp'n at 24.)  However, because the Court finds that Plaintiff fails to plead scienter as to the Individual Defendants, their allegations concerning corporate scienter similarly fail.  *See In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 223 n.11 (E.D.N.Y. 2022) (finding that corporate scienter was not adequately pleaded because plaintiff failed to plead an individual whose scienter can be imputed to the company, and because plaintiffs failed to identify a sufficiently dramatic statement that would support an inference of corporate scienter); *see also Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283 n. 8 (finding that plaintiffs failed to plead corporate scienter because they failed to assert that the statements at issue in the case were so important and dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false).

II.     **Exchange Act Section 20(a)**

Because scienter has not been adequately pleaded, Plaintiff's claim under Section 20 of the Exchange Act cannot stand and must also be dismissed.  *In re Sanofi*, 87 F. Supp 3d at 527 ("If plaintiffs have not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Securities Act or Exchange Act, then the § 20(a) claims must be dismissed."). [6]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the amended complaint for failure to state a claim is GRANTED.  Plaintiff's amended complaint is dismissed in its entirety.

**SO ORDERED.**

Dated:  **Brooklyn, New York**　　　　　　　　　　　**/s/**
　　　　**January 18, 2024**　　　　　　　　　**ORELIA E. MERCHANT**
　　　　　　　　　　　　　　　　　　**United States District Judge**

---

[6] Having determined Plaintiff failed to sufficiently allege Defendants acted with scienter, the Court need not reach Defendants' additional arguments.